**BNS INC., a Delaware corporation, Plaintiff,**

v.

**KOPPERS COMPANY, INC., a Delaware corporation, Charles F. Barber, Evelyn Berezin, Anthony J.A. Bryan, Fletcher L. Byrom, Dr. Richard M. Cyert, Edward Domley, Daniel N. Galbreath, William H. Knoell, Andrew W. Mathieseon, Charles R. Pullin, Glen C. Tenley, Dr. Romesh Wadhawani,**

and

**Charles M. Oberly, III, Attorney General of the State of Delaware,**

and

**Michael E. Harkins, Secretary of State of the State of Delaware, Defendants.**

**Civ. A. No. 88–130 MMS.**

United States District Court,
D. Delaware.

April 1, 1988.

As Amended May 9, 1988.

Steven D. Goldberg of Theisen, Lank, Mulford and Goldberg, P.A., E. Norman Veasey, Charles F. Richards, Jr., Allen M. Terrell, Jr., Gregory P. Williams, and Joseph J. Bodnar of Richards, Layton & Finger, Wilmington, Del., Edwin Mishkin of Cleary, Gottlieb, Steen & Hamilton, New York City, of counsel, for plaintiff.

Charles S. Crompton, Jr., Peter M. Sieglaff, and Gregory A. Inskip of Potter, Anderson & Corroon, Wilmington, Del., for defendants Koppers Co., Inc., Charles F. Barber, Evelyn Berezin, Anthony, J.A. Bryan, Fletcher L. Byrom, Dr. Richard M. Cyert, Edward Domley, Daniel N. Galbreath, William H. Knoell, Andrew W. Mathieseon, Charles R. Pullin, Glen C. Tenley, Dr. Romesh Wadhawani.

A. Gilchrist Sparks, III of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendants Charles M. Oberly, III, and Michael E. Harkins.

## OPINION

MURRAY M. SCHWARTZ, Chief Judge.

BNS Inc. ("BNS") brings this action against Koppers Company, Inc. ("Koppers"), the Attorney General of the State of Delaware, Charles M. Oberly, III, and the Secretary of State of the State of Delaware, Michael E. Harkins, seeking an order declaring unconstitutional the newly-enacted Delaware Business Combinations statute, Del.Code Ann. tit. 8, § 203 (1988)[1] (the "Delaware Act" or "section 203"). BNS also requests that the Court either declare Kopper's stock purchase rights plan (the "rights plan") invalid or order Koppers to redeem the stock purchase rights.[2]

BNS urges the Delaware Act frustrates the purposes of the Williams Act, 15 U.S.C. §§ 78m(d)–(e), 78n(d)–(f) (1982), and is thus preempted by operation of the supremacy clause. Additionally, BNS argues the Delaware Act impermissibly burdens interstate commerce and accordingly is void on commerce clause grounds. BNS bases its attack on the rights plan on the assertion that the refusal of Kopper's Board of Directors to redeem the stock purchase rights violates the directors' fiduciary obligations to the stockholders.

The defendants insist BNS's assault on the Delaware Act must fail, contending that (i) the state statute does not conflict with the Williams Act because the Williams Act covers only tender offers, and not the transactions regulated by section 203; (ii) section 28(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78bb(a) (1982), indicates that Congress intended federal regulation of securities to coexist with state regulation of state-created corporations; (iii) the plaintiff mischaracterizes the purposes of the Williams Act and a truer characterization reveals that the Delaware statute is consistent with Williams Act concerns; and (iv) a proper application of commerce clause analysis demonstrates that the Delaware statute survives commerce clause scrutiny. Koppers takes issue as well with the plaintiff's arguments regarding the rights plan.

---

1. Citations are to the title and section where the legislation will be codified.

2. During oral argument on March 23, 1988, counsel for BNS also requested that the Court issue a temporary restraining order compelling defendant Koppers to give notice to the plaintiff prior to declaring an irrevocable dividend. This request was denied in a ruling from the bench on March 28, 1988.

For the reasons below I find the Delaware Act regulating post-tender offer business combinations most likely constitutional. The plaintiff thus has failed to demonstrate probable success on the merits and the preliminary injunction based on the alleged unconstitutionality of the statute will be denied. Because the plaintiff additionally has failed to demonstrate that the rights plan most probably will immediately, irreparably injure BNS, the Court also will deny the motion for a preliminary injunction on the basis of the alleged invalidity of Koppers's rights plan.

## I. FACTS

### A. *The Offer*

BNS is a Delaware corporation owned by three entities: Bright Aggregates Inc., a Delaware corporation and wholly-owned subsidiary of Beazer PLC ("Beazer"), an English public limited company, SL–Merger, Inc., a Delaware corporation and wholly-owned indirect subsidiary of Shearson Lehman Brothers Holdings Inc. ("Shearson Lehman"), also a Delaware corporation, and Speedward Limited, an English company and wholly-owned indirect subsidiary of NatWest Investment Bank ("NatWest"), an English company. BNS's owners incorporated BNS for the purpose of making a tender offer for Koppers's shares.

Koppers is a Delaware corporation with its principal executive offices in Pittsburgh. Koppers's business consists primarily of construction materials and services work. Approximately forty percent of Koppers's business involves chemicals and allied products activity.

Beazer is a general construction company active in the construction and sale of residential housing, the development and management of commercial property, general contracting and consulting with respect to construction and engineering, and the production of cement, concrete, and concrete products.

On March 3, 1988, BNS commenced its tender offer for all of the more than 28,-000,000 outstanding shares of Koppers common stock and all of the more than 150,000 outstanding shares of cumulative preferred stock four percent series of Koppers. Having been extended twice, the offer is scheduled to expire at midnight on April 7, 1988. BNS initially offered to purchase the common stock for $45 per share and the cumulative preferred stock for $107.75 per share. For the first several days following the announcement of BNS's offer, Koppers's stock traded at levels significantly above BNS's offer price.[3] Koppers's board recommended rejection of the $45 offer. On March 20 BNS raised its offer for the common stock to $56 per share. The stock continued to trade at levels slightly above BNS's offer price, but the disparity was less dramatic. Koppers again rejected the offer as inadequate. On March 25, BNS again raised its offer—this time to $60. The stock is now trading below this figure. Koppers's board has not yet acted on this further sweetened offer.

BNS states in its offer materials that following a successful takeover of Koppers, and provided certain conditions are met, BNS will seek a merger or other business combination with Koppers, after which BNS plans to sell Koppers's chemicals and related business. The merger or other similar business combination would be accomplished by converting the remaining shares of Koppers common stock into the right to receive the same cash price paid pursuant to the tender offer. The planned merger accords similar treatment to the holders of Koppers preferred stock.

Among other conditions, BNS hinges its offer on a finding by this Court that the Delaware Act is unconstitutional or that the Act does not apply to the transaction contemplated by BNS, unless the eventual course of events operates to render the Act otherwise inapplicable.

Governor Castle signed the Delaware Act on February 2, 1988. The Act applies

---

**3.** The offer began on March 3rd. Between March 4th and March 18th, the stock traded between $49¾ and $54⅞.

to all Delaware corporations, with certain limited exceptions. The provisions of the Act are summarized below.[4]

### B. *The Rights Plan*

In addition to avoiding section 203, BNS conditions its offer on the redemption of the rights issued pursuant to Koppers's rights plan, or on BNS otherwise escaping from the prospective resulting dilution of its ownership.

In February of 1986, Koppers adopted a stock purchase rights plan in the form of a dividend to stockholders. The dividend consisted of one right per share of common stock to purchase 1/100th of a share of Junior participating preferred stock. The exercise price of the right is $75. The rights plan was amended to provide that, unless a "triggering event" occurs, (1) the rights cannot be exercised, (2) the rights do not trade separately from the common stock, and (3) the rights are not represented by separate certificates. The plan defines a triggering event as the earlier of

(1) ten days following the date of a public announcement that a person (or group) has acquired 20% or more of Koppers's outstanding common (the "stock acquisition date"), or

(2) ten business days following the commencement of a tender offer or at such later date as may be determined by the board.

Under the plan as amended on March 15, 1988, the rights are redeemable by Koppers's board at any time until ten days following the stock acquisition date, "or at such later date as the Directors may determine." The effect of this amendment is to extend the date on which the rights would have detached from March 17, ten business days following the commencement of the offer, until ten business days following BNS's purchase of the tendered stock—or earlier, if the board so decides. Cyert Affidavit, ¶¶ 7, 26 (D.I. 29). The redemption price is five cents per right.

If Koppers is acquired in a merger or other business combination after the rights become exercisable, each right entitles its holder to buy Koppers common stock at a value double the exercise price of $75 (the "flip-in"). The plan voids rights owned by the acquiror. The flip-in provision becomes operative when any person acquires more than 30% of the outstanding common of Koppers. The flip-in becomes inoperative if Koppers's board approves the terms of the acquisition, and if the acquisition is then carried out in accordance with the approved terms. Another provision, the "flip-over," allows each rights holder to buy $150 worth of stock in the acquiring company for $75. As with the flip-in provision, board approval exempts acquirors from the flip-over.

BNS challenges the reasonableness of the board's refusal to redeem the rights.

## II. ANALYSIS

In order to succeed on its motion for a preliminary injunction, BNS must establish: (1) a reasonable probability of eventual success in the litigation, and (2) that irreparable injury will ensue if relief is not granted. In addition, the court may consider (3) the possibility of harm to other interested persons from the grant or denial of relief, and (4) the public interest. *Constructors Ass'n of Western Penna. v. Kreps,* 573 F.2d 811, 815 (3d Cir.1978); *Delaware River Port Auth. v. Transamerica Trailer Transp., Inc.,* 501 F.2d 917, 919–20 (3d Cir.1974). *Kennecott Corp. v. Smith,* 637 F.2d 181, 187 (3rd Cir.1980). If BNS can demonstrate a reasonable probability of success on the merits with respect to either of its constitutional claims, it appears that the remaining elements would weigh toward granting an injunction in BNS's favor. The injury threatened by the effect of the statute, i.e., possible defeat of the offer, "is precisely the harm sought to be avoided by the Williams Act."[5] *Kennecott,* 637 F.2d

---

4. Because it is not yet widely available, section 203 is reproduced in the appendix to this opinion. A summary of its provisions appears in Part II, section A.2 of this opinion.

5. The defendants contend that the plaintiff has not alleged a justiciable case or controversy. Article III requires actual or threatened injury, causation, and redressability. *See Allen v.*

at 188. In this instance, therefore, the elements of probability of success and irreparable injury stand or fall together.

The second shot in BNS's salvo, aimed primarily at the poison pill, will find its mark if the plaintiff shows both probable success on the merits and that irreparable injury will result from permitting Koppers to retain the power to trigger the pill. Initially the Court will review the constitutional challenges, turning afterward to the validity of the directors' actions.

### A. BNS's Constitutional Challenges
### 1. Background: State Takeover Statutes

Following the United States Supreme Court's decision in *Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), which invalidated the Illinois Business Takeover Act on commerce clause grounds, and in effect struck down virtually every other state takeover statute, many states enacted "second generation" takeover legislation. *See, Note, The Constitutionality of Second Generation Takeover Statutes,* 73 Va.L.Rev. 203, 204 (1987) [hereinafter "Second Generation Statutes"]. In the portion of the *MITE* opinion constituting the opinion of the Court, Justice White found the Illinois statute indirectly burdened interstate commerce, and held that the burden imposed outweighed any legitimate state interests promoted by the statute. *MITE,* 457 U.S. at 643–46, 102 S.Ct. at 2641–43.[6]

State legislatures addressed the problem of regulating tender offers in the wake of *MITE* by reconstructing their statutes into four forms more closely resembling traditional state corporation laws: control share acquisitions statutes,[7] fair price provision statutes,[8] right of redemption statutes,[9] and business combination statutes.[10] *See Second Generation Statutes* at 207–12. By reconstructing their takeover statutes in the form of traditional corporate governance regulation, states hoped to avoid the commerce clause infirmities of the Illinois legislation invalidated in *MITE.* See Langevoort, *Comment, The Supreme Court and the Politics of Corporate Takeovers: A Comment on CTS Corp. v. Dynamics Corp. of America,* 101 Harv.L.Rev. 96, 98 (1987). Several of the second generation statutes, such as those of Indiana and Maryland,[11] combine two or more types of post-*MITE* state takeover regulation. Because the Supreme Court's affirmation of Indiana's second generation statute in *CTS Corp. v. Dynamics Corp.,* —— U.S. ——, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987), rests on certain features of that law in relation to the Williams Act, a brief description of Indiana's control share acquisition statute clarifies analysis of the constitutionality of the Delaware statute.

---

*Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). All three are present. The plaintiff *may* suffer injury if the statute and the poison pill apply. Although the injury is not certain, it is more than merely conjectural. Moreover, the injury if it occurs will be caused by the defendants, and is within the Court's power to redress. Given the finding of probable irreparable injury on the constitutional claim, this argument must fail.

**6.** Another portion of Justice White's opinion, joined only by Chief Justice Burger and Justices O'Connor and Stevens, analyzed the statute as invalid because its jurisdictional scope extended to tender offers taking place completely beyond the state's borders and was therefore invalid as a direct restraint on interstate commerce. *Id.* at 641–43, 102 S.Ct. at 2640–41 (opinion of White, J.).

**7.** *See* Ind.Code Ann. § 23–1–42 (Burns Supp. 1986); Minn.Stat.Ann. § 302A.671 (West 1985 &

Supp.1987); Mo.Ann.Stat. § 351.407 (Vernon Supp.1987); Ohio Rev.Code Ann. §§ 1701.831 (Anderson 1985).

**8.** *See, e.g.,* Md.Corps. & Ass'ns Code Ann. §§ 3–601 to –603 (1985 & Supp.1986).

**9.** *See, e.g.,* Pa.Stat.Ann. tit. 15 §§ 1408(B), 1409(C), 1910 (Purdon Supp.1986); Me.Rev.Stat. Ann. tit. 13–A, § 910 (Supp.1986); Utah Code Ann. § 16–10–76.5 (Supp.1986).

**10.** Ind.Code Ann. § 23–1–43 (Burns Supp.1986); Ky.Rev.Stat.Ann. § 271A.397(3) (Baldwin Supp. 1986); Mo.Ann.Stat. § 351.459 (Vernon Supp. 1987); N.Y.Bus.Corp. Law § 912(a)(5) (McKinney 1986).

**11.** *See* Ind.Code Ann. §§ 23–1–42, –43 (West Supp.1987); Md.Corps. & Ass'ns Code Ann. §§ 3–601 to –603 (1985 & Supp.1986).

Indiana's control share acquisition statute operates quite differently from the Delaware approach. The Indiana statute strips acquired blocks of shares of voting rights, allowing for reinstatement of voting rights following shareholder approval. The acquiror's voting rights resume if a majority of the disinterested—i.e., non-acquiror, non-management—shares vote to restore the acquiror's voting rights at the next annual meeting or at a special shareholders meeting held within fifty days of the acquiror's request (and paid for by the acquiror). *See* Ind. Code Ann. § 23–1–42–3, –7, –10(b). A separate part of Indiana's takeover statute aims at post-transaction business combinations, resembling the fourth type of state response to *MITE. See* Ind. Code Ann. § 23–1–43.

The most important statutory reaction to *MITE* for current purposes is the business combination statute. First enacted by New York, and most recently by Delaware, this type of statute prohibits certain business combinations between an "interested shareholder" and the target corporation for an extended period of time—five years in the case of New York's statute, and three years in Delaware's section 203.[12] Busi-

ness combination statutes typically contain exceptions allowing for friendly offerors to consummate post-takeover transactions. Common examples include board approval,[13] or board approval plus a vote of a supermajority of the stockholders.[14] Business combination restrictions shield shareholders from the coerciveness of front-end loaded, two-tier offers by preventing the offeror from effecting the second step of the offer unless the target's board of directors and, in some instances, the target's shareholders, approve the transaction.

### 2. The Delaware Statute

Delaware's statute, which may qualify as a "third generation" statute, having been passed after *CTS*, is modeled after the kind of second generation statute pioneered in New York.[15] Section 203 encompasses a variety of transactions between a stockholder and the corporation of whose outstanding voting stock the stockholder owns at least 15%. The full statute is reproduced in the appendix to this opinion, but, put simply, it prevents "business combinations," broadly defined,[16] between an "interested stockholder"[17] and the target cor-

---

**12.** *See* Del.Code Ann. 8, § 203(a); N.Y.Bus.Corp. Law § 912 (McKinney 1986).

**13.** *See* Del.Code Ann. tit. 8, § 203(a)(1); Ind. Code Ann. § 23–1–43–18.

**14.** *See* Del.Code Ann. tit. 8, § 203(a)(3); Ky.Rev. Stat.Ann. § 271A.397.

**15.** Delaware's law is less restrictive in that the moratorium on combinations lasts only three years rather than five, and in some of its provisions for avoiding restrictions on business combinations. *See* N.Y.Bus.Corp. Law § 912 (McKinney 1986).

**16.** The statute defines business combinations as: (i) any merger or consolidation of the corporation or any direct or indirect majority-owned subsidiary of the corporation with (A) the interested stockholder, or (B) with any other corporation if the merger or consolidation is caused by the interested stockholder and as a result of such merger or consolidation subsection (a) of this section is not applicable to the surviving corporation;

**17.** The statute defines an interested stockholder as:

any person (other than the corporation and any direct or indirect majority-owned subsidi-

ary of the corporation) that (i) is the owner of 15% or more of the outstanding voting stock of the corporation, or (ii) is an affiliate or associate of the corporation and was the owner of 15% or more of the outstanding voting stock of the corporation at any time within the 3–year period immediately prior to the date on which it is sought to be determined whether such person is an interested stockholder; and the affiliates and associates of such person; provided, however, that the term 'interested stockholder' shall not include (x) any person who (A) owned shares in excess of the 15% limitation set forth herein as of, or acquired such shares pursuant to a tender offer commenced prior to, December 23, 1987 or pursuant to an exchange offer announced prior to the aforesaid date and commenced within 90 days thereafter and continued to own shares in excess of such 15% limitation or would have but for action by the corporation or (B) acquired said shares from a person described in (A) above by gift, inheritance or in a transaction in which no consideration was exchanged; or (y) any person whose ownership of shares in excess of the 15% limitation set forth herein is the result of action taken solely by the corporation provided that such person shall be an interested stockholder if thereafter he ac-

poration [18] for a three-year period, unless one of the exceptions to the statute applies.

Subsection (a) of section 203 [19] sets forth three ways an interested stockholder otherwise subject to the section may escape its moratorium on business combinations. Subsection (b) lists circumstances in which the section will not apply at all. Subsection (a) allows a tender offeror to consummate a second step merger or other business combination where: (1) the board approves the combination prior to the date the offeror becomes an interested stockholder; (2) the transaction which transforms the stockholder into an interested stockholder results in the interested stockholder owning at least 85% of the outstanding voting stock, excluding for the purposes of calculating that percentage shares owned by officers who are also directors and certain employee stock plans; (3) the board of directors approves the business combination after the person becomes an interested stockholder and the proposed combination is authorized by 66⅔ of the outstanding voting stock not owned by the interested stockholder.

Subsection (b) lists six circumstances in which section 203 will not apply.[20] Subsec-

---

quires additional shares of voting stock of the corporation, except as a result of further corporate action not caused, directly or indirectly, by such person. For the purpose of determining whether a person is an interested stockholder, the voting stock of the corporation deemed to be outstanding shall include stock deemed to be owned by the person through application of paragraph (8) of this subsection but shall not include any other unissued stock of such corporation which may be issuable pursuant to any agreement, arrangement or understanding, or upon exercise of conversion rights, warrants or options, or otherwise,

18. The law reaches beyond hostile takeovers, covering almost every situation in which an investor's equity proportion rises above 15% without prior board approval.

19. Subsection (a) of section 203 provides:

(a) Notwithstanding any other provisions of this chapter, a corporation shall not engage in any business combination with any interested stockholder for a period of 3 years following the date that such stockholder became an interested stockholder, unless (1) prior to such date the board of directors of the corporation approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder, or (2) upon consummation of the transaction which resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding for purposes of determining the number of shares outstanding those shares owned (i) by persons who are directors and also officers and (ii) employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer, or (3) on or subsequent to such date the business combination is approved by the board of directors and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least 66⅔ of the outstanding voting stock which is not owned by the interested stockholder.

20. Subsection (b) reads as follows:

(b) The restrictions contained in this section shall not apply if:

(1) the corporation's original certificate of incorporation contains a provision expressly electing not to be governed by this section;

(2) the corporation, by action of its board of directors, adopts an amendment to its bylaws within 90 days of the effective date of this section expressly electing not to be governed by this section, which amendment shall not be further amended by the board of directors;

(3) the corporation, by action of its stockholders, adopts an amendment to its certificate of incorporation or bylaws expressly electing not to be governed by this section, provided that, in addition to any other vote required by law, such amendment to the certificate of incorporation or bylaws must be approved by the affirmative vote of a majority of the shares entitled to vote. An amendment adopted pursuant to this paragraph shall not be effective until 12 months after the adoption of such amendment and shall not apply to any business combination between such corporation and any person who became an interested stockholder of such corporation on or prior to such adoption. A bylaw amendment adopted pursuant to this paragraph shall not be further amended by the board of directors;

(4) the corporation does not have a class of voting stock that is (i) listed on a national securities exchange, (ii) authorized for quotation on an inter dealer quotation system of a registered national securities association or (iii) held of record by more than 2,000 stockholders, unless any of the foregoing results from action taken, directly or indirectly, by an interested stockholder or from a transac-

tion (b)(1) permits newly-organized corporations to exempt themselves from the statute. Subsection (b)(2) gives the board of directors of a Delaware corporation until May 3, 1988,[21] to amend the corporation's bylaws to "opt-out" of the coverage of the statute. Because the terms of the directors on Koppers's board are staggered, BNS cannot avail itself of this provision of the statute.

The third subparagraph, (b)(3), gives stockholders the power to amend the corporation's bylaws or certificate of incorporation in order to place the corporation outside the statute. Such an amendment will not be effective for twelve months, however. Further, a successful offeror is forbidden from using a stockholder amendment opt-out. Only persons who become interested stockholders after the amendment may take advantage of it.

Subsection (b)(4) exempts certain small companies not listed on a national exchange, quoted through a national securi-

ties association, or with fewer than 2,000 stockholders. The fifth subsection provides that persons who become interested stockholders inadvertently, e.g., through gift or inheritance, are not bound by section 203.

The sixth subsection of 203(b) releases a bidder from combination restrictions when management—or a third party approved by management—proposes a merger, sale of substantial assets, or tender or exchange offer for more than 50% of the outstanding voting stock. In that event, the bidder may devise a competing proposal within twenty days of the announcement of the management-endorsed proposal. This exception allows stockholders an opportunity to consider competing bids.

### 3. Preemption

Before examining the Delaware Act's viability in the face of the Williams Act's purposes, a look at what those purposes are is necessary.

tion in which a person becomes an interested stockholder;

(5) a stockholder becomes an interested stockholder inadvertently and (i) as soon as practicable divests sufficient shares so that the stockholder ceases to be an interested stockholder and (ii) would not, at any time within the 3 year period immediately prior to a business combination between the corporation and such stockholder, have been an interested stockholder but for the inadvertent acquisition; or

(6) the business combination is proposed prior to the consummation or abandonment of and subsequent to the earlier of the public announcement or the notice required hereunder of a proposed transaction which (i) constitutes one of the transactions described in the second sentence of this paragraph; (ii) is with or by a person who either was not an interested stockholder during the previous 3 years or who became an interested stockholder with the approval of the corporation's board of directors; and (iii) is approved or not opposed by a majority of the members of the board of directors then in office (but not less than 1) who were directors prior to any person becoming an interested stockholder during the previous 3 years or were recommended for election or elected to succeed such directors. The proposed transactions referred to in the preceding sentence are limited to (x) a merger or consolidation of the corporation (except for a merger in respect of which, pursuant to section 251 of this chapter, no vote of the stockholders of the corporation

is required); (y) a sale, lease, exchange, mortgage, pledge, transfer or other disposition (in one transaction or a series of transactions), whether as part of a dissolution or otherwise, of assets of the corporation or of any direct or indirect majority-owned subsidiary of the corporation (other than to any direct or indirect wholly-owned subsidiary or to the corporation) having an aggregate market value equal to 50% or more of either that aggregate market value of all of the assets of the corporation determined on a consolidatedbasis or the aggregate market value of all the outstanding stock of the corporation; or (z) a proposed tender or exchange offer for 50% or more of the outstanding voting stock of the corporation. The corporation shall give not less than 20 days notice to all interested stockholders prior to the consummation of any of the transactions described in clauses (x) or (y) of the second sentence of the paragraph. Notwithstanding paragraphs (1), (2), (3) and (4) of this subsection, a corporation may elect by a provision of its original certificate of incorporation or any amendment thereto to be governed by this section, provided that any such amendment to the certificate of incorporation shall not apply to restrict a business combination between the corporation and an interested stockholder of the corporation if the interested stockholder became such prior to the effective date of the amendment.

21. Governor Castle signed the legislation on February 2, 1988.

### a. The Purposes of the Williams Act

Congress added the Williams Act, Pub.L. No. 90–439, 82 Stat. 454 (codified as amended at 15 U.S.C. §§ 78m(d)–(e), 78n(d)–(f) (1982)), to the system of federal securities regulation to fill a gap in the disclosure scheme set up by the 1933 and 1934 securities laws. *See Piper v. Chris–Craft Industries,* 430 U.S. 1, 22, 97 S.Ct. 926, 939, 51 L.Ed.2d 124 (1977); 113 Cong. Rec. 854–55, 24,664 (1967). In the familiar words of the bill's sponsor, Senator Williams:

> Every effort has been made to avoid tipping the balance of regulatory burden in favor of management or in favor of the offeror. The purpose of this bill is to require full and fair disclosure for the benefit of stockholders while at the same time providing the offeror and management equal opportunity to fairly present their case.

113 Cong.Rec. 854–55 (1967) (statement of Sen. Williams). The Securities Act of 1933 and the Exchange Act of 1934 provided for disclosure to investors in every area of securities transfers but that to which the Williams Act addresses itself: tender offers and the stock acquisitions which typically precede them. Hence, prior to 1968, shareholders were privy to information about issuers, the financial condition of issuers, plans for the funds raised from the issue, information relevant to securities bought or sold in the secondary markets, and a variety of other facts, *see* T. Hazen, *The Law of Securities Regulation* §§ 1.1, 1.2 (Lawyers' ed. 1985 & Supp. 1987), but were not provided with similar information regarding the tender offeror.

Between the 1930's and the 1960's, cash tender offers grew in popularity as a mode of corporate acquisition. *See Edgar v. MITE,* 457 U.S. 624, 632, 102 S.Ct. 2629, 2635, 73 L.Ed.2d 269 (1982). Responding to the increasing number of corporate transactions beyond the scope of the regulatory framework, Congress constructed a statute imposing several disclosure requirements on tender offerors and their targets. The rationale for requiring disclosure was (and is) shareholder protection. Shareholders were at a disadvantage compared to a potential acquiror in terms of information relevant to making a decision on the merits of the offer. In mandating disclosure, Congress deliberately contemplated requirements that would have a neutral effect on the balance of power between target management and the acquiror. *See Piper v. Chris–Craft Industries,* 430 U.S. 1, 30, 97 S.Ct. 926, 943, 51 L.Ed.2d 124 (1977).

This "careful balance," *CTS,* 107 S.Ct. at 1645, is not an end in itself. It is rather Congress's judgment regarding the means for achieving shareholder protection. *See CTS,* 107 S.Ct. at 1645–46; *Hyde Park Partners, L.P. v. Connolly,* 839 F.2d 837, 849–50 (1st Cir.1988). Consequently, as the *CTS* Court points out, incidental effects on the relative positions of offerors and target managements caused by legislation intended to promote shareholder welfare do not contravene the purposes of the Williams Act.

> Of course, by regulating tender offers, the Act makes them more expensive and thus deters them somewhat, but this type of reasonable regulation does not alter the balance between management and offeror in any significant way. The principal result of the Act is to grant shareholders the power to deliberate collectively about the merits of tender offers. This result is fully in accord with the purposes of the Williams Act.

107 S.Ct. at 1646 n. 7. And as Judge Coffin reasoned in *Hyde Park,*

> [the Court's] task is to identify the *principal result* of [the state law], and to distinguish between that effect and any consequences that are merely secondary or incidental. One probative test is to determine if the regulation alters the balance between management and offeror in any significant way, but this is not in itself dispositive. [The Court's] focus should remain on determining whether the disclosure provisions are beneficial to the investors caught between management and offerors.

*Hyde Park Partners, L.P. v. Connolly,* 839 F.2d 837, 850–51 (1st Cir.1988) (emphasis in original).

**468**

### b. The Delaware Act

■ In examining the application of the preemption doctrine to the Delaware act, the threshold inquiry is the reach of the state legislation. If the state law does not intrude upon the federally regulated field, the state law is not endangered by the supremacy clause and further preemption analysis is unnecessary. Delaware argues here that because literal compliance with both the Williams Act and Section 203 is possible, and because section 203 does not affect the tender offer process itself, the preemption analysis ends. This argument rests on a too narrow view of the scope of the Williams Act. As the *CTS* Court recognized, statutes which regulate the ability of a successful offeror to control the target, whether through voting rights restrictions or otherwise, plainly implicate Williams Act policies. *See CTS*, 107 S.Ct. at 1645–46.

The purpose of the Delaware legislation, as presented in the synopsis to the act and in certain testimony during the hearings,[22] is to protect shareholders from the coercive aspects of some tender offers. Given this plain statement of legislative purpose, the argument that the act does not affect Williams Act goals seems disingenuous. Admittedly, the Williams Act confines its provisions to disclosure requirements and procedural guidelines for the actual tender offer, and does not address the rights of a successful offeror once the tender is completed. The point of requiring disclosure, however, is to give stockholders sufficient, balanced information upon which to choose whether to tender their shares. The Delaware Act operates to restrict the choice of stockholders, albeit for the shareholders' own welfare. The legislature has determined that restricting stockholder choice merely corrects for the coerciveness inherent in many tender offers by eliminating the possibility of second-step freezeouts at a lower price.[23] This Court need not disturb that legislative judgment, but the fact remains that the law restricts shareholder choice in the hostile tender offer context. Preventing states from unduly interfering with the tender offer itself but allowing them to deprive the tender offeror of perhaps the most important fruit of gaining control, i.e., a business combination, would permit a de facto frustration of the goals of the Williams Act.[24]

■ Having passed through the threshold inquiry concerning the statutes' overlap, preemption scrutiny of the Delaware Act must begin with the proposition that the power of the states to regulate tender offers does not extend to complete eradication of hostile offers. Delaware contests this proposition. Delaware's argument assumes that *any* advantage given to management in the name of shareholder protection, however significant, is in keeping with the Williams Act. This contention stretches *CTS*'s reasoning too far. A statute that favors management to an extreme degree in effect will foreclose hostile tender offers entirely.

■ *CTS* unmistakably teaches that states have a legitimate interest in regulat-

---

**22.** Hearings at 57 (remarks of A. Gilchrist Sparks, Chairman of the Delaware State Bar Association's Corporation Law Section). The purpose of the legislation also is laid out in the synopsis. *See* appendix at 476–480. *See also supra* n. 31, discussing the legislative history of the act.

**23.** A freezeout occurs when a controlling shareholder forces minority shareholders to surrender their shares in exchange for cash or debt securities. Without fair price or other protection, a corporation's shareholders could be pressured into surrendering their shares in the first stage of a tender offer, for fear that a second stage freezeout at a lower price will follow. This coercive aspect of "front-loaded" two-step, or two-tier offers, provides a significant amount

of the current momentum toward and justification for state legislation regulating takeovers. *See, e.g.,* Transcript of Hearing Before the Delaware General Assembly, House and Senate Judiciary Committees, Jan. 20–21, 1988, at 44–45 (D.I. 26) (question by Representative David Ennis) [hereinafter "Hearings"]; *Impact of Corporate Takeovers: Hearings Before the Subcomm. on Securities of the Senate Comm. on Banking, Housing, and Urban Affairs,* 99th Cong., 1st Sess. 379–80, 469 (1985) (study by Office of the Chief Economist of the SEC) [hereinafter "Impact Hearings"].

**24.** It is worth noting that the Delaware statute does allow a successful bidder to exercise all other aspects of control save business combinations.

ing tender offers, despite the significant influence such regulation has over the transfer of securities and the so-called market for corporate control. *See CTS*, 107 S.Ct. at 1647–48, 1651–52. Notwithstanding this well-established interest, the proposition that states may so heavily regulate hostile tender offers as to eliminate them altogether is untenable given the Supreme Court's interpretation of the goals of the Williams Act. As the *Piper* Court noted in its examination of the legislative history of the Williams Act, Congress did not intend the Williams Act to favor either target management or offerors, but rather to protect the individual investor. *Piper*, 430 U.S. at 30, 97 S.Ct. at 943. In devising a scheme of investor protection, Congress recognized that "takeover bids could often serve a useful function," and that "entrenched management, equipped with considerable weapons in battles for control, tended to be successful in fending off possibly beneficial takeover attempts." *Id.* The original bill introduced by Senator Williams was strongly pro-management, *id.*, but Congress revised the bill to achieve a "policy of evenhandedness," *id.* at 31, 97 S.Ct. at 944, and through this policy to further the ultimate goal of investor protection by leaving room for hostile bids to succeed.

■ From the premise that the state cannot eliminate hostile tender offers comes the hoary question to what extent a state may limit them. *CTS* contemplates some degree of limitation, but does not set forth a pellucid test. Therefore, this Court must infer from *Piper v. Chris–Craft*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977), *Edgar v. MITE*, 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982), and *CTS Corp. v. Dynamics Corp.*, —— U.S. ——, 107 S.Ct. 1637, 95 L.Ed.2d 67 (1987), what degree of restriction of tender offers is constitutional. The plaintiff argues that a substantial alteration of the balance between management and the offeror conflicts with the Williams Act. The fair import of the cases, however, is that even statutes with substantial deterrent effects on tender offers do not circumvent Williams Act goals, so long as hostile of-

fers which are beneficial to target shareholders have a meaningful opportunity for success. Applying the analysis of *CTS* to section 203 and assessing the effects of 203's exceptions shows that the statute and the Williams Act can co-exist.

■ In *CTS*, as here, the state statute will be preempted only if it "frustrates the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). Following the analysis of Justice Powell, whether the Delaware statute frustrates the purposes of the Williams Act may be determined by asking four questions. *CTS*, 107 S.Ct. at 1646. First, does the statute protect independent shareholders from coercion? Second, does the statute give either management or the offeror an advantage in communicating with stockholders? This question may be reformulated to fit the circumstances of the present case by phrasing it as whether the statute gives either management or the offeror an advantage in consummating or defeating an offer. Third, does the statute impose an indefinite or unreasonable delay on offers? And fourth, does the statute allow the state government to interpose its views of fairness between willing buyers and sellers? The answers to these questions indicate that, although the issue is not an easy one, on this preliminary injunction record, the Delaware statute does not conflict with the purposes of the Williams Act to an impermissible degree.

The statute offers protection to independent shareholders by preventing certain dealings between a successful offeror and the target corporation. In so doing, the statute eliminates most unsanctioned (by the target's board with or without the shareholders) freezeouts, or post-tender offer mergers between the offeror and the company whereby remaining shareholders are forced to sell their stock for cash or securities. Preventing unapproved mergers also effectively eliminates many leveraged buyouts, in which the assets of the target company provide resources for servicing the debt incurred by the bidder in taking control.

While the statute does give target management an advantage in fighting an unwanted takeover, *CTS* suggests that incidentally pro-management measures undertaken to benefit shareholders do not offend Williams Act policies. *See CTS*, 107 S.Ct. at 1646 n. 7. The *CTS* Court found the Indiana statute's main advantage to management, the delay beyond the twenty-day SEC minimum for holding offers open, a reasonable delay that did not conflict with the Williams Act. The Indiana statute, however, also was one about which Justice Powell could state: "the statute now before the Court protects the independent shareholder against both of the contending parties." *Id.* at 1645. Section 203 does not lend itself to such a characterization. This Court is unable, though, to divine the full extent of the advantage bestowed on incumbent management by the law, and on this record cannot find that the advantage outweighs the benefits conferred on shareholders.

As to the delay caused by the statute, it imposes none on the actual purchase of shares. And although the statute delays the acquisition of full control following purchase for three years if no exception applies, a staggered board delays shifts of control for two years. The additional theoretical one-year delay is not troublesome for preemption purposes. *See CTS*, 107 S.Ct. at 1647.

Finally, the Delaware statute does not interpose the state government's views of fairness between willing buyers and sellers. Instead, section 203 permits incumbent management and a minority of the stockholders to impose their views of fairness on willing but sometimes overreaching buyers and willing but sometimes coerced sellers. Legislative judgment that management may be trusted to act in the best interests of shareholders is subject to criticism. *See, e.g.,* Fischel, *The "Race to the Bottom" Revisited: Reflections on Recent Developments in Delaware's Corpo-*

*ration Law,* 76 Nw. U.L. Rev. 913 (1982) (summarizing former SEC Chairman William Cary's position on the pro-management bias of state corporation law and how this bias allegedly hurts shareholders). Nevertheless, entrusting management to protect shareholders is the norm in current corporate law. Moreover, the heightened judicial scrutiny of management imposed by Delaware law in the takeover context, *see Unocal Corp. v. Mesa Petroleum*, 493 A.2d 946 (Del.1985), no doubt also will apply to the decisions of boards with respect to proposed business combinations. Therefore, notwithstanding the pro-management tilt of the Delaware statute, Delaware's section 203 more probably than not is within the sphere of constitutional state regulation of tender offers.

Section 203 alters the balance between target management and the offeror, perhaps significantly. Yet the section will be constitutional notwithstanding its pro-management slant, so long as it does not prevent an appreciable number of hostile bidders from navigating the statutory exceptions.

Leaving aside for the moment the exceptions specified in subsection (b), there are three major "outs" or escapes of subsection (a). The first, board approval, however, will necessarily be absent in the hostile takeover context,[25] leaving the bidder with just two escape routes. These two outs work in favor of target management, and accordingly to the detriment of the offeror. But on this record, the statute appears to offer hostile bidders the necessary degree of opportunity to effect a business combination.

The second escape route relieves the offeror from the statute's strictures if eighty-five percent of the stockholders (excluding shares held by officer-directors and certain employee stock ownership plans ("ESOPs")),[26] tender their shares. This es-

---

**25.** Section 203(a)(1). Most initially hostile tender offers are eventually negotiated. *See Impact Hearings* at 367–68.

**26.** The statute excludes ESOPs which do not allow participating employees to determine con-

fidentially whether the ESOP shares will be tendered in a tender or exchange offer.

cape may place a heavy burden on the offeror hoping to consummate the transaction despite the opposition of management, but the evidence is conflicting.

According to Commissioner Grundfest, an investigation by the SEC revealed "no example in the history of hostile takeovers ... where a hostile bidder obtained 90% of a target's shares if management was hostile through to the end." Hearings at 24. Apparently in response to this concern, the recommended bill lowered the percentage exemption from 90% to 85%, and excluded some management and ESOP shares from the calculation. *See* State's Br. at 15. Whether this relaxation will permit a sufficient number of hostile-to-the-end offers remains to be seen. Commissioner Grundfest suggested a threshold figure of 75%, "or some other realistic figure." Affidavit of Michael Houghton, D.I. 20, Exh. 5 (Letter of Dec. 10, 1987, from Joseph Grundfest to David Brown) [hereinafter "Houghton aff."] Grundfest recommended that the 75% figure exclude *all* shares held by management. *Id.* In another letter, *see* Houghton aff., exh. 8, Grundfest likened a 65% threshold to a political "victory by a landslide." *See also* Affidavit of Steven B. Wolitzer, D.I. 14, ¶ 6 ("It would ... be extremely difficult, if not impossible, to obtain 85% of the Common Shares of Koppers by the expiration of the tender offer in the face of opposition by the Board of Koppers, regardless of the fairness of the price being offered.")

In the other corner on the 85% question, Martin Lipton commented that "[i]t will be a rare situation where a tender offer will not attract 85% of the target's non-management stock." Houghton aff., exh. 9. Similarly, Raymond Groth, of First Boston, stated that "the vast majority of tender offers which are not abandoned have resulted in the acquisition of more than 85% of the shares of the target." Groth aff., ¶ 8 (D.I. 30).

A possible explanation of the differences of opinion on this issue may lie in the assumption on the plaintiff's side, which is absent on the defendants' side, that the Koppers board will remain hostile to the BNS offer. Negotiated acquisitions often will result in a higher percentage of stock purchased. *See Impact Hearings* at 386. This Court, however, is not prepared to rule on the appropriate percentage of post-tender ownership required to insulate minority stockholders from coercive two-tier bids in the absence of facts refuting the state's determination, as contrasted to unsubstantiated intuitive opinion. Such facts are not present here [27]; accordingly, subsection (a)(2) must be viewed as giving hostile offerors an opportunity to consummate their offers and receive full control despite management opposition.

The third escape, board approval *and* approval of two-thirds of the nontendering stockholders (again excluding the offeror, but *including* management), subsection (a)(3), also possibly places a substantial burden on would-be acquirors. The vote requires the offeror to woo and win two-thirds of the very group—including management—that refused initially to tender. This supermajority vote contrasts with that in place in Indiana, where tendering and nontendering shareholders—excluding management—vote on the rights of the acquiror by a simple majority. Stand-

---

27. The Court notes the irony of the defendant Koppers's position here compared to its position before the federal court in Los Angeles, where Koppers has intervened in a proceeding between BNS and the federal government concerning antitrust implications of the proposed takeover. The California litigation has provoked Koppers to argue that BNS will be unable to take control of Koppers, in part because of the well documented "five percent" of shareholders that do not respond to any tender offer, regardless of price. This phenomenon of 5% of shareholders not responding, along with Koppers management and directors' holdings of 3.4%, effectively prevents BNS, according to Koppers, from purchasing 90% of the outstanding shares of Koppers. *See* Excerpt from Morrow & Co. aff., quoted in the letter of March 28, 1988, from Edwin B. Mishkin to this Court. In this litigation, however, a tender offer resulting in 85% ownership, in order to avoid the statute, is lauded by Koppers as a perfectly reasonable requirement. *See* Groth Aff., ¶ 6 (D.I. 30). Given the management's ownership of 3.4% and the fact that 5% of shareholders make no response to a tender offer, the reality is BNS must receive 92% of the remaining outstanding shares to navigate the second escape route.

ing alone, this exception might well be illusory.

In sum, the effects of the three exceptions contained in subsection (a) are not easily predictable. The legislature's judgment is that those escapes, together with the exceptions specified in subsection (b), allow offers beneficial to shareholders to proceed, and thus save the statute from constitutional infirmity.

Notwithstanding section 203's possible injurious effects, because it benefits stockholders, and because the legislature presumably has balanced the countervailing effects and found the degree of stockholder protection to offset potential harm to stockholders, the Court concludes that the statute will be in all likelihood constitutional and not preempted. If the method Delaware has chosen to protect stockholders in fact on balance harms them, then at that time reconsideration of the statute's congruence with the Williams Act will be warranted.

Subsection (b)'s provisions, with the exception of subsection (b)(6), which allows competitive bidding in certain circumstances, do not materially alter the effect of the statute. Subsection (b)(1), which permits newly-organized companies to exempt themselves from the statute, of course does not apply to all of the companies now in existence. Subsection (b)(2) (allowing the board of a company to opt-out of the statute) will expire in early May of this year, and will be primarily applicable to non-staggered boards. Subsection (b)(3) by its own terms is ineffective for a year, and may not be used by a successful offeror. Subsection (b)(4) merely excludes certain small companies from the statute. Subsection (b)(5) provides that stockholders whose ownership rises above the fifteen percent threshold inadvertently are not subject to the statute, and therefore does not cover hostile tender offers.

### 4. Commerce Clause Defects

■ The second constitutional defect of the statute, BNS asserts, is that it places an undue burden on interstate commerce. This argument is unpersuasive. The three-step commerce clause inquiry set forth in *CTS* reveals that the statute harmonizes well with commerce clause dictates in the state takeover regulation context.

The *CTS* Court analyzed the Indiana statute's compliance with the commerce clause by using a three-part test: (1) are the effects of the statute discriminatory? [28]; (2) does the statute create an impermissible risk of inconsistent regulation? [29]; and (3) does the statute promote stable corporate relationships and protect shareholders? [30] The answers to these questions demonstrate that the plaintiff's commerce clause arguments miss the mark.

The effects of Delaware's regulation of corporations it charters in the area of business combinations are not discriminatory. States may regulate their own corporate citizens. "No principle of corporate law is more firmly established than a State's authority to regulate domestic corporations...." *CTS*, 107 S.Ct. at 1649. Section 203 does not discriminate between offerors which are Delaware corporations and offerors which are not incorporated here.

The second part of the *CTS* commerce clause test, pertaining to the risk of inconsistent regulation, also may be answered negatively. The *MITE* Court strongly criticized the Illinois statute because of its extraterritorial effects. *See Edgar v. MITE Corp.*, 457 U.S. 624, 642, 102 S.Ct. 2629, 2640, 73 L.Ed.2d 269 (1982) (plurality opinion of White, J.). Conversely, the *CTS* Court identified an advantage of Indiana's statute as being that it applied only to Indiana corporations with a significant number of Indiana resident shareholders. *CTS*, 107 S.Ct. at 1649, 1652. The fact that a vast majority of Delaware's corporations do not have their main office in Delaware or many resident shareholders does not prevent Delaware from regulating tender offers affecting these corporations and does not inevitably create a risk of inconsistent regulation. *See id.* at 1649.

---

**28.** *CTS*, 107 S.Ct. at 1648–49.

**29.** *Id.* at 1649.

**30.** *Id.* at 1649–52.

Thirdly, the Delaware statute both promotes stable corporate relationships and protects shareholders. In so doing, the statute reflects valid state concerns.[31] Indications that the stated purpose of the statute may not wholly conform with the legislature's true motives, however strong, must be ignored where the statute does accomplish the stated purpose. The Constitution does not require state corporate law to be pure of concern for the state's financial well-being, so long as the statute does not circumvent the policies of the commerce clause.

Section 203 is an exquisitely crafted legislative response to a variety of perceived problems. Were it less delicately constructed to remain within the sphere of constitutionality, the outcome of this Court's analysis might be quite different. But nothing prevents a state legislature from extending its power to the limits of constitutionality.

For the reasons stated above, I conclude on the record before me that it is probable the Delaware Act will be held constitutional. Accordingly, BNS has failed to establish a probability of success on the merits. An order will be entered denying BNS's application for a preliminary injunction.

### B. *Koppers's Poison Pill: The Rights Plan*

BNS's attack on the Koppers rights plan centers on the reasonableness of the directors' refusal to redeem the rights in light of BNS's offer. The role of the Court in assessing the decisions made by directors in the hostile tender offer context is an intricate composite of deference to the business expertise of the directors and close scrutiny of incumbent management decisions. The Delaware law detailing the Court's role is mapped out in three recent decisions: *Revlon, Inc. v. MacAndrews & Forbes Holdings*, 506 A.2d 173 (Del.1986); *Moran v. Household International, Inc.*, 500 A.2d 1346 (Del.1985); and *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946 (Del.1985).

The presence of a hostile bidder strains the ability of a board of directors to act in the best interests of its shareholders, because of "the omnipresent specter that a board may be acting primarily in its own interests...." *Unocal*, 493 A.2d at 954. Consequently, before directors may rely on the presumptions accorded them by the business judgment rule, the Delaware courts require the directors to overcome two additional hurdles. First, the directors must show that reasonable grounds existed for believing there was "a danger to corporate policy and effectiveness." *Id.* at 955; *see Revlon, Inc. v. MacAndrews & Forbes Holdings*, 506 A.2d 173, 180 (Del.1986) (relying on *Unocal*). Second, the directors must show that their response was "reasonable in relation to the threat posed." *Unocal*, 493 A.2d at 955.

**31.** The legislative history of the Delaware Act reflects a mixed bag of motives. Prominent among these was the legislative perception that takeover tactics employed by individuals such as T. Boone Pickens and Carl Icahn were harmful to stockholders and target corporations. *See, e.g., Hearings* at 7-9 (testimony of Michael Harkins, Secretary of State of the State of Delaware). No less prominent, however, was the worry that failure to enact a anti-takeover law would jeopardize the $170 million in franchise taxes and fees, currently representing 17% of gross state revenues, which Delaware receives each year from corporations appreciative of the state's corporate law policies. *See, e.g., Hearings* at 2 (testimony of Representative Charles Hebner), 6 (testimony of Secretary Michael Harkins), 60–62 (testimony of A. Gilchrist Sparks). The testimony before the joint judiciary committees of the Delaware legislature is replete with references to revenues, but these references take us less far than the plaintiff wishes to go. The statute's furtherance of Delaware's pecuniary interests does not automatically render it unconstitutional. Along with the concerns voiced for protecting state revenues, other witnesses expressed concerns for shareholder welfare, and the legislators vigorously questioned both opponents and proponents of the bill. *See, e.g., Hearings* at 66–75 (Senator Sharp's and Senator McDowell's questions of Mr. Sparks).

While the legislative history of section 203 is not free of protectionist sentiment, neither is it devoid of concern for the group putatively benefited—the stockholders of Delaware corporations. It is manifestly not this Court's place to reject the legislature's offered justification for section 203 absent clear proof that this justification is only a pretense. Such proof is missing.

To clear the first hurdle, showing a plausible basis for perceiving a threat to the corporation, the directors must demonstrate that they acted in good faith, after having investigated the putative threat and options for countering it. *Id.; see Revlon,* 506 A.2d 173, 180. The board can meet the second hurdle by showing that the nature of the takeover and its probable effect on the corporation justifies the board's defensive stance. *Id.*

■ Once a board satisfactorily establishes that it had reasonable grounds for believing a danger existed and that the defensive tactics employed were reasonable in relation to that danger, the business judgment rule applies. That rule prevents courts from revisiting decisions made in a particular business context.[32] *Aronson v. Lewis,* 473 A.2d 805 (Del.1984) sets forth an oft-quoted capsulization of the rule: "It is a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was taken in the best interests of the company." *Id.* at 812 (citations omitted).

■ To overcome the presumption enjoyed by the directors by virtue of the business judgment rule, the plaintiff has the "burden of persuasion to show a breach of the directors' fiduciary duties." *Moran,* 500 A.2d at 1356. The plaintiff may meet its burden by producing evidence that the directors have acted solely or primarily for the purposes of perpetuating themselves in office, i.e., for the purposes of entrenchment. *See Unocal,* 493 A.2d at 958. Additionally, the plaintiff may meet its burden by demonstrating that the board breached a fiduciary duty "such as fraud, overreaching, lack of good faith, or being uninformed...." *Id.*

■ BNS has focused its attack on the refusal of Koppers's board to redeem the rights and thus defuse the poison pill. BNS concedes that adoption of the pill was within the authority of the board, *see Moran,* 500 A.2d at 1351–53, and that the subsequent amendments were proper. Transcript of Hearing before Schwartz, C.J., on March 23, 1988, at 47. BNS's sole complaint regarding the pill is that the board of directors has not redeemed the rights.

The directors of Koppers have a continuing duty to evaluate the fitness of their defensive strategy in light of developments in the ongoing battle. *See Moran,* 500 A.2d at 1354. ("The Board has no more discretion in refusing to redeem the Rights than it does in enacting any defensive mechanism."). *Unocal* supplies the standard for monitoring whether the directors have acted in keeping with their duty. Thus, the propriety of the Koppers board's particular defensive strategy, threatened use of the poison pill, depends on whether (i) Koppers's board can surmount the two *Unocal* hurdles of reasonably perceived danger and an appropriate response; and (ii) if so, whether BNS can demonstrate that the Koppers board breached its fiduciary duties. *See Moran,* 500 A.2d at 1356.

The directors have not breached their duty. Their actions appear to have been in good faith, and were taken after a relatively full investigation of BNS's offers. Given the nature of the BNS offer, the board's responses thus far have been reasonable.

Just prior to the commencement of BNS's offer, at the board's regularly scheduled monthly meeting, the directors reviewed Koppers's financial position in depth. Answering Brief of Defendant Koppers Company at 13. Materials concerning the review of the company's financial position were disseminated two weeks before the meeting. Information regarding the company's worth and prospects thus was fresh in the minds of the directors when BNS launched its first offer. After the offer, the directors met again, on March 10, 1988, to evaluate the bid. They determined to explore available alternatives before responding to the offer, and instructed their investment banker, First

---

**32.** The rule has two aspects. One aspect operates to shield the individual directors from liability for exercising their discretion in making business decisions. The other aspect shields the decisions themselves from later attack. *See Revlon,* 506 A.2d at 180 n. 10.

Boston, to investigate the adequacy of the offer.

In the opinion of First Boston, the $45 offer was inadequate, except with respect to the preferred shares. Affidavit of Raymond C. Groth, ¶ 3 (D.I. 30). The board rejected the offer only after conducting a serious review of several relevant factors, including: (i) the board's assessment of the value of the company; (ii) the advice of First Boston; (iii) the possibility of other transactions yielding greater value to Koppers stockholders; and (iv) the likelihood of the BNS offer failing.

Following BNS's sweetening of its initial offer to $56, the Koppers board held a special meeting on March 22, 1988, to decide its position. By a unanimous vote of all the directors who were present, the board again rejected the offer as inadequate. The bases for this rejection were similar to those outlined above. First Boston and Dillon Read opined that the higher offer was also inadequate. The company communicated to its stockholders the recommendation, stating that, in the eyes of the directors, "the Company remaining independent would be a superior alternative over the long term to accepting the revised BNS Offer." Letter of March 22, 1988, from Charles R. Pullin, Chairman and Chief Executive Officer of Koppers, to Koppers stockholders.

The Court finds the actions of the Koppers directors reasonable in light of the risk posed by the BNS offer. The plaintiff's complaint breaks into two parts. First, the plaintiff urges that its offer cannot constitute a threat. Second, the plaintiff contends that Koppers's board must redeem the rights because refusal to do so is unreasonable given BNS's offer. Contrary to the plaintiff's assertions, the inadequacy of the offering price does present a threat to the company and its stockholders. While the board is not permitted to engage in whatever defensive measures it pleases in light of BNS's offer, the measures resorted to thus far have not been disproportionate.

The board is considering implementing a recapitalization plan, but it has not yet done so. This Court cannot determine ahead of time the reasonableness or unreasonableness of any action by Koppers's board with regard to such a plan. Only after firmer action by the board, such as an endorsement and announcement of a particular plan, would intervention *possibly* be appropriate.

The fact that a majority of Koppers's board of directors is disinterested enhances Koppers's *Unocal* showing. *See Ivanhoe Partners v. Newmont Mining Corporation,* 535 A.2d 1334, 1343 (Del.1987). The board's enactment of the poison pill without the consent or approval of the stockholders does not make the board "interested," and *AC Acquisitions Corp. v. Anderson, Clayton & Co.,* 519 A.2d 103 (Del.Ch.1986), does not hold otherwise.

*AC Acquisitions* involved actions by target directors which foreclosed stockholder choice. Chancellor Allen based his holding that the directors' conduct was not reasonable in relation to the threat posed on the preclusion of the shareholders from accepting the hostile offer over the company's alternative. *See id.* at 113. The case does not stand for the proposition cited by the plaintiff, that directors become interested when they adopt defensive mechanisms without shareholder approval. Rather, *AC Acquisitions* deplores a board acting to cut off the possibility of success of a competing offer which the board's investment banker was unable to call inadequate. *See id.* at 110.

In oral argument, counsel for BNS contended that there was evidence that Koppers's board had not behaved with good faith in rejecting BNS's offers. On the record thus far, this contention appears unwarranted. The board had reviewed the company's financial position just prior to the commencement of BNS's first offer. The third offer, for $60, is pending. Koppers's board extended the date on which the rights were to detach from March 17 until such time as the directors shall determine. In so doing, the board left open the possibility that it would later redeem the rights.

A large part of BNS's lack of good faith argument turns on the refusal of Koppers's board to negotiate with BNS. Whether or not Koppers is under a duty to negotiate is questionable. The plaintiff has cited no Delaware Supreme Court case imposing such a duty on directors. *See* Plaintiff's Memorandum in Support of Plaintiff's Motion for a Declaratory Judgment and a Preliminary Injunction, at 49 n. 22. Even assuming such a duty exists, the directors have not taken any irrevocable steps to defeat BNS's offer, nor have they implemented any defensive measures which effectively have placed the company up for auction. *See Revlon*, 506 A.2d at 182. In any event, in the face of the Koppers board's refusal to negotiate or to redeem the rights, BNS has raised its offer twice.

To overcome the directors showing that their decisions with regard to BNS's offer deserve deference under the business judgment rule, the plaintiff must show that these decisions were undertaken solely or primarily in order to entrench themselves in office, or that the directors otherwise breached their fiduciary duties. *See Pogostin v. Rice*, 480 A.2d 619, 627 (Del.1984); *Johnson v. Trueblood*, 629 F.2d 287, 292–93 (3d Cir.1980), *cert. denied*, 450 U.S. 999, 101 S.Ct. 1704, 68 L.Ed.2d 200 (1981) (applying Delaware law). Thus far, the plaintiff has not brought forward evidence sufficient to show entrenchment or breach of fiduciary duty.

Based on the above, the plaintiff has failed to show either a probability of success on the merits or irreparable injury. An order will issue consistent with this opinion.

## APPENDIX

§ 203 *Business Combinations with Interested Stockholders*

(a) Notwithstanding any other provisions of this chapter, a corporation shall not engage in any business combination with any interested stockholder for a period of 3 years following the date that such stockholder became an interested stockholder, unless (1) prior to such date the board of directors of the corporation approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder, or (2) upon consummation of the transaction which resulted in the stockholder becoming an interested stockholder, the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding for purposes of determining the number of shares outstanding those shares owned (i) by persons who are directors and also officers and (ii) employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer, or (3) on or subsequent to such date the business combination is approved by the board of directors and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least 66⅔ of the outstanding voting stock which is not owned by the interested stockholder.

(b) The restrictions contained in this section shall not apply if:

(1) the corporation's original certificate of incorporation contains a provision expressly electing not to be governed by this section;

(2) the corporation, by action of its board of directors, adopts an amendment to its bylaws within 90 days of the effective date of this section expressly electing not to be governed by this section, which amendment shall not be further amended by the board of directors;

(3) the corporation, by action of its stockholders, adopts an amendment to its certificate of incorporation or bylaws expressly electing not to be governed by this section, provided that, in addition to any other vote required by law, such amendment to the certificate of incorporation or bylaws must be approved by the affirmative vote of a majority of the shares entitled to vote. An amendment adopted pursuant to this paragraph shall not be effective until 12 months after the adoption of such amendment and shall not apply to any business combination

between such corporation and any person who became an interested stockholder of such corporation on or prior to such adoption. A bylaw amendment adopted pursuant to this paragraph shall not be further amended by the board of directors;

(4) the corporation does not have a class of voting stock that is (i) listed on a national securities exchange, (ii) authorized for quotation on an inter dealer quotation system of a registered national securities association or (iii) held of record by more than 2,000 stockholders, unless any of the foregoing results from action taken, directly or indirectly, by an interested stockholder or from a transaction in which a person becomes an interested stockholder;

(5) a stockholder becomes an interested stockholder inadvertently and (i) as soon as practicable divests sufficient shares so that the stockholder ceases to be an interested stockholder and (ii) would not, at any time within the 3 year period immediately prior to a business combination between the corporation and such stockholder, have been an interested stockholder but for the inadvertent acquisition; or

(6) the business combination is proposed prior to the consummation or abandonment of and subsequent to the earlier of the public announcement or the notice required hereunder of a proposed transaction which (i) constitutes one of the transactions described in the second sentence of this paragraph; (ii) is with or by a person who either was not an interested stockholder during the previous 3 years or who became an interested stockholder with the approval of the corporation's board of directors; and (iii) is approved or not opposed by a majority of the members of the board of directors then in office (but not less than 1) who were directors prior to any person becoming an interested stockholder during the previous 3 years or were recommended for election or elected to succeed such directors. The proposed transactions referred to in the preceding sentence are limited to (x) a merger or con-

solidation of the corporation (except for a merger in respect of which, pursuant to section 251 of this chapter, no vote of the stockholders of the corporation is required); (y) a sale, lease, exchange, mortgage, pledge, transfer or other disposition (in one transaction or a series of transactions), whether as part of a dissolution or otherwise, of assets of the corporation or of any direct or indirect majority-owned subsidiary of the corporation (other than to any direct or indirect wholly-owned subsidiary or to the corporation) having an aggregate market value equal to 50% or more of either that aggregate market value of all of the assets of the corporation determined on a consolidated basis or the aggregate market value of all the outstanding stock of the corporation; or (z) a proposed tender or exchange offer for 50% or more of the outstanding voting stock of the corporation. The corporation shall give not less than 20 days notice to all interested stockholders prior to the consummation of any of the transactions described in clauses (x) or (y) of the second sentence of the paragraph. Notwithstanding paragraphs (1), (2), (3) and (4) of this subsection, a corporation may elect by a provision of its original certificate of incorporation or any amendment thereto to be governed by this section, provided that any such amendment to the certificate of incorporation shall not apply to restrict a business combination between the corporation and an interested stockholder of the corporation if the interested stockholder became such prior to the effective date of the amendment.

(c) As used in this section only, the term:

(1) 'affiliate' means a person that directly, or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, another person,

(2) 'associate,' when used to indicate a relationship with any person, means (i) any corporation or organization of which such person is a director, officer or partner or is, directly or indirectly, the owner of 20% or more of any class of voting

stock, (ii) any trust or other estate in which such person has at least a 20% beneficial interest or as to which such person serves as trustee or in a similar fiduciary capacity, and (iii) any relative or spouse of such person, or any relative of such spouse, who has the same residence as such person,

(3) 'business combination,' when used in reference to any corporation and any interested stockholder of such corporation, means:

(i) any merger or consolidation of the corporation or any direct or indirect majority-owned subsidiary of the corporation with (A) the interested stockholder, or (B) with any other corporation if the merger or consolidation is caused by the interested stockholder and as a result of such merger or consolidation subsection (a) of this section is not applicable to the surviving corporation;

(ii) any sale, lease, exchange, mortgage, pledge, transfer or other disposition (in one transaction or a series of transactions), except proportionately as a stockholder of such corporation, to or with the interested stockholder, whether as part of a dissolution or otherwise, of assets of the corporation or of any direct or indirect majority-owned subsidiary of the corporation which assets have an aggregate market value equal to 10% or more of either the aggregate market value of all the assets of the corporation determined on a consolidated basis or the aggregate market value of all the outstanding stock of the corporation;

(iii) any transaction which results in the issuance or transfer by the corporation or by any direct or indirect majority-owned subsidiary of the corporation of any stock of the corporation or of such subsidiary to the interested stockholder, except (A) pursuant to the exercise, exchange or conversion of securities exercisable for, exchangeable for or convertible into stock of such corporation or any such subsidiary which securities were outstanding prior to the time that the interested stock-holder became such, (B) pursuant to a dividend or distribution paid or made, or the exercise, exchange or conversion of securities exercisable for, exchangeable for or convertible into stock of such corporation or any such subsidiary which security is distributed, pro rata to all holders of a class or series of stock of such corporation subsequent to the time the interested stockholder became such, (C) pursuant to an exchange offer by the corporation to purchase stock made on the same terms to all holders of said stock, or (D) any issuance or transfer of stock by the corporation, provided however, that in no case under (B)—(D) above shall there be an increase in the interested stockholder's proportionate share of the stock of any class or series of the corporation or of the voting stock of the corporation;

(iv) any transaction involving the corporation or any direct or indirect majority-owned subsidiary of the corporation which has the effect, directly or indirectly, of increasing the proportionate share of the stock of any class or series, or securities convertible into the stock of any class or series, of the corporation or of any such subsidiary which is owned by the interested stockholder, except as a result of immaterial changes due to fractional share adjustments or as a result of any purchase or redemption of any shares of stock not caused, directly or indirectly, by the interested stockholder; or

(v) any receipt by the interested stockholder of the benefit, directly or indirectly (except proportionately as a stockholder of such corporation) of any loans, advances, guarantees, pledges, or other financial benefits (other than those expressly permitted in subparagraphs (i)—(iv) above) provided by or through the corporation or any direct or indirect majority owned subsidiary.

(4) 'control,' including the term 'controlling,' 'controlled by' and 'under common control with,' means the possession, directly or indirectly, of the power to direct

or cause the direction of the management and policies of a person, whether through the ownership of voting stock, by contract, or otherwise. A person who is the owner of 20% or more of a corporation's outstanding voting stock shall be presumed to have control of such corporation, in the absence of proof by a preponderance of the evidence to the contrary. Notwithstanding the foregoing, a presumption of control shall not apply where such person holds voting stock, in good faith and not for the purpose of circumventing this section, as an agent, bank, broker, nominee, custodian or trustee for one or more owners who do not individually or as a group have control of such corporation.

(5) 'interested stockholder' means any person (other than the corporation and any direct or indirect majority-owned subsidiary of the corporation) that (i) is the owner of 15% or more of the outstanding voting stock of the corporation, or (ii) is an affiliate or associate of the corporation and was the owner of 15% or more of the outstanding voting stock of the corporation at any time within the 3-year period immediately prior to the date on which it is sought to be determined whether such person is an interested stockholder; and the affiliates and associates of such person; provided, however, that the term 'interested stockholder' shall not include (x) any person who (A) owned shares in excess of the 15% limitation set forth herein as of, or acquired such shares pursuant to a tender offer commenced prior to, December 23, 1987 or pursuant to an exchange offer announced prior to the aforesaid date and commenced within 90 days thereafter and continued to own shares in excess of such 15% limitation or would have but for action by the corporation or (B) acquired said shares from a person described in (A) above by gift, inheritance or in a transaction in which no consideration was exchanged; or (y) any person whose ownership of shares in excess of the 15% limitation set forth herein is the result of action taken solely by the corporation provided that such person shall be an interested stockholder if thereafter he acquires additional shares of voting stock of the corporation, except as a result of further corporate action not caused, directly or indirectly, by such person. For the purpose of determining whether a person is an interested stockholder, the voting stock of the corporation deemed to be outstanding shall include stock deemed to be owned by the person through application of paragraph (8) of this subsection but shall not include any other unissued stock of such corporation which may be issuable pursuant to any agreement, arrangement or understanding, or upon exercise of conversion rights, warrants or options, or otherwise,

(6) 'person' means any individual, corporation, partnership, unincorporated association or other entity.

(7) 'voting stock' means stock of any class or series entitled to vote generally in the election of directors.

(8) 'owner' including the terms 'own' and 'owned' when used with respect to any stock means a person that individually or with or through any of its affiliates or associates:

(i) beneficially owns such stock, directly or indirectly; or

(ii) has (A) the right to acquire such stock (whether such right is exercisable immediately or only after the passage of time) pursuant to any agreement, arrangement or understanding, or upon the exercise of conversion rights, exchange rights, warrants or options, or otherwise; provided, however, that a person shall not be deemed the owner of stock tendered pursuant to a tender or exchange offer made by such person or any of such person's affiliates or associates until such tendered stock is accepted for purchase or exchange; or (B) the right to vote such stock pursuant to any agreement, arrangement or understanding; provided, however, that a person shall not be deemed the owner of any stock because of such person's right to vote such stock if the agreement, arrange-

ment or understanding to vote such stock arises solely from a revocable proxy or consent given in response to a proxy or consent solicitation made to 10 or more persons; or

(iii) has any agreement, arrangement or understanding for the purpose of acquiring, holding, voting (except voting pursuant to a revocable proxy or consent as described in item (B) of clause (ii) of the paragraph), or disposing of such stock with any other person that beneficially owns, or whose affiliates or associates beneficially own, directly or indirectly, such stock.

(d) No provision of a certificate of incorporation or bylaw shall require, for any vote of stockholders required by this section, a greater vote of stockholders than that specified in this section.

(e) The Court of Chancery is hereby vested with exclusive jurisdiction to hear and determine all matters with respect to this section.

[ (f) ] The provisions of this Act are severable and any provision held invalid shall not affect or impair any of the remaining provisions of this Act.

### SYNOPSIS

Section 203 is intended to strike a balance between the benefits of an unfettered market for corporate shares and the well documented and judicially recognized need to limit abusive takeover tactics. To achieve this end, the statue [sic] will delay for three years business combinations with acquirors not approved by the board unless the acquiror is able to obtain in his offer 85% of the stock as defined in the statue [sic]. This provision is intended to encourage a full and fair offer. Following the principles of corporate democracy, two-thirds of the stockholders other than the acquiror may vote or exempt a given business combination from the restrictions of the statue [sic]. Any corporation may decide to opt out the statue [sic] within 90 days of enactment by action of its board or, at any time, by action of its stockholders. The effect of stockholder action in this regard is delayed for 12 months to avoid circumvention of the statue [sic].

The statue [sic] is not intended to alter the case law development of directors' fiduciary duties of care and loyalty in responding to challenges to control or the burden of proof with respect to compliance with those duties. Nor is the statue [sic] intended to prevent the use of any other lawful defensive measure.