CITY CAPITAL ASSOCIATES LIMITED PARTNERSHIP, a Delaware limited partnership, Cardinal Holdings Corp., a Delaware corporation, Cardinal Acquisition Corp., a Delaware corporation, Plaintiffs,

v.

INTERCO INCORPORATED, a Delaware corporation, Harvey Saligman, Richard B. Loynd, R. Stuart Moore, Charles J. Rothschild, Jr., Ronald L. Aylward, Donald E. Lasater, Harry M. Krogh, Lee Liberman, Mark H. Lieberman, Robert H. Quenon, William E. Cornelius, Marilyn S. Lewis and Thomas H. O'Leary, Defendants.

Civ. A. No. 10105.

Court of Chancery of Delaware, New Castle County.

Submitted: Oct. 24, 1988.
Decided: Nov. 1, 1988.

Rodman Ward, Jr., Stephen P. Lamb, Paul L. Regan, Robert E. Zimet, Jay B. Kasner, and Charles F. Walker, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, and New York City, for plaintiffs.

Charles F. Richards, Jr., Samuel A. Nolen, and Thomas A. Beck, of Richards, Layton & Finger, Wilmington, and Michael W. Schwartz, and Robert A. Ragazzo, of Wachtell, Lipton, Rosen & Katz, New York City, for defendants.

## OPINION

ALLEN, Chancellor.

This case, before the court on an application for a preliminary injunction, involves the question whether the directors of Interco Corporation are breaching their fiduciary duties to the stockholders of that company in failing to now redeem certain stock rights originally distributed as part of a defense against unsolicited attempts to take control of the company. In electing to leave Interco's "poison pill" in effect, the

board of Interco seeks to defeat a tender offer for all of the shares of Interco for $74 per share cash, extended by plaintiff Cardinal Acquisition Corporation. The $74 offer is for all shares and the offeror expresses an intent to do a back-end merger at the same price promptly if its offer is accepted. Thus, plaintiffs' offer must be regarded as noncoercive.

As an alternative to the current tender offer, the board is endeavoring to implement a major restructuring of Interco that was formulated only recently. The board has grounds to conclude that the alternative restructuring transaction may have a value to shareholders of at least $76 per share. The restructuring does not involve a Company self-tender, a merger or other corporate action requiring shareholder action or approval.

It is significant that the question of the board's responsibility to redeem or not to redeem the stock rights in this instance arises at what I will call the end-stage of this takeover contest. That is, the negotiating leverage that a poison pill confers upon this company's board will, it is clear, not be further utilized by the board to increase the options available to shareholders or to improve the terms of those options. Rather, at this stage of this contest, the pill now serves the principal purpose of "protecting the restructuring"—that is, precluding the shareholders from choosing an alternative to the restructuring that the board finds less valuable to shareholders.

Accordingly, this case involves a further judicial effort to pick out the contours of a director's fiduciary duty to the corporation and its shareholders when the board has deployed the recently innovated and powerful antitakeover device of flip-in or flip-over stock rights. That inquiry is, of course, necessarily a highly particularized one.

In *Moran v. Household International, Inc.*, Del.Supr., 500 A.2d 1346 (1985), our Supreme Court acknowledged that a board of directors of a Delaware corporation has legal power to issue corporate securities that serve principally not to raise capital for the firm, but to create a powerful financial disincentive to accumulate shares of the firm's stock. Involved in that case was a board "reaction to what [it] perceived to be the threat in the market place of coercive two-tier tender offers." 500 A.2d at 1356. In upholding the board's power under Sections 157 and 141 of our corporation law to issue such securities or rights, the court, however, noted that:

> When the Household Board of Directors is faced with a tender offer and a request to redeem rights, they will not be able to arbitrarily reject the offer. They will be held to the same fiduciary standards any other board of directors would be held to in deciding to adopt a defensive mechanism, the same standard they were held to in originally approving the Rights Plan. *See Unocal*, 493 A.2d at 954–55, 958.

*Moran v. Household International, Inc.*, Del.Supr., 500 A.2d at 1354. Thus, the Supreme Court in *Moran* has directed us specifically to its decision in *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985) as supplying the appropriate legal framework for evaluation of the principal question posed by this case.[1]

In addition to seeking an order requiring the Interco board to now redeem the Company's outstanding stock rights, plaintiffs seek an order restraining any steps to implement the Company's alternative restructuring transaction.

For the reasons that follow, I hold that the board's determination to leave the stock rights in effect is a defensive step

---

**1.** In saying that *Unocal* supplies the framework for decision of this aspect of the case, I reject plaintiffs' argument that the board bears a burden to demonstrate the entire fairness of its decision to keep the pill in place while its recapitalization is effectuated. *Ivanhoe Partners v. Newmont Mining Corp.*, Del.Supr., 535 A.2d 1334, 1341 (1987). While the recapitalization does represent a transaction in which the 14 person board (and most intensely, its seven inside members) has an interest—in the sense referred to in *Unocal*—it does not represent a self-dealing transaction in the sense necessary to place upon the board the heavy burden of the intrinsic fairness test. *See Weinberger v. U.O.P., Inc.*, Del.Supr., 457 A.2d 701 (1983); *Sinclair Oil Corp. v. Levien*, Del.Supr., 280 A.2d 717 (1971).

that, in the circumstances of this offer and at this stage of the contest for control of Interco, cannot be justified as reasonable in relationship to a threat to the corporation or its shareholders posed by the offer; that the restructuring itself does represent a reasonable response to the perception that the offering price is "inadequate;" and that the board, in proceeding as it has done, has not breached any duties derivable from the Supreme Court's opinion in *Revlon v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173 (1986).

I turn first to a description of the general background facts. The facts necessary for a determination of the issue relating to the stock rights are, however, set forth later with particularity. (*See* pp. 795–796).

## I.

*Interco Incorporated.*

Interco is a diversified Delaware holding company that comprises 21 subsidiary corporations in four major business areas: furniture and home furnishings, footwear, apparel and general retail merchandising. Its principal offices are located in St. Louis, Missouri. The Company's nationally recognized brand names include London Fog raincoats; Ethan Allen, Lane and Broyhill furniture; Converse All Star athletic shoes and Le Tigre and Christian Dior sportswear. The Company's sales for fiscal 1988 were $3.34 billion, with earnings of $3.50 a share. It has approximately 36 million shares of common stock outstanding.[2]

The Company's subsidiaries operate as autonomous units. Rather than seeing the subsidiaries as parts of an integrated whole, the constituent companies are viewed by Interco management as "a port-

folio of assets whose investment merits have to be periodically reviewed." (Saligman Dep. at 12). Owing to the lack of integration between its operating divisions, the Company is, in management's opinion, particularly vulnerable to a highly leveraged "bust-up" takeover of the kind that has become prevalent in recent years. To combat this perceived danger, the Company adopted a common stock rights plan, or poison pill, in late 1985, which included a "flip-in" provision.

The board of directors of Interco is comprised of 14 members, seven of whom are officers of the Company or its subsidiaries.

*The Rales Brothers' Accumulation of Interco Stock; The Interco Board's Response.*

In May, 1988, Steven and Mitchell Rales began acquiring Interco stock through CCA. The stock had been trading in the low 40's during that period. Alerted to the unusual trading activity taking place in the Company's stock, the Interco board met on July 11, 1988 to consider the implications of that news. At that meeting, the board redeemed the rights issued pursuant to the 1985 rights plan and adopted a new rights plan that contemplated both "flip-in" and "flip-over" rights.

In broad outline, the "flip-in" provision contained in the rights plan adopted on July 11 provides that, if a person reaches a threshold shareholding of 30% of Interco's outstanding common stock, rights will be exercisable entitling each holder of a right to purchase from the Company that number of shares per right as, at the triggering time, have a market value of twice the exercise price of each right.[3] The "flip-over" feature of the rights plan provides

---

**2.** Plaintiff City Capital Associates Limited Partnership ("CCA" or "City Capital") is a Delaware limited partnership. The partnership is owned by two limited partners, Patrick W. Allender and Michael G. Ryan, each of whom owns a 1% interest, and two general partners, City GP I, Inc. and City GP II, Inc., each of which owns a 49% interest in City Capital. Steven M. Rales is the sole shareholder of GP I, and his brother, Mitchell P. Rales, is the sole shareholder of GP II. Moving down the business structure, City Capital owns 100% of Cardinal Holdings Corpo-

ration which, in turn, owns 100% of Cardinal Acquisition Corporation. Cardinal Acquisition is the entity extending the offer to purchase. Unless otherwise noted, references to CCA are meant to include the offeror.

**3.** Rights, however, will not be exercisable in the event that an acquiror who holds 20% or less of Interco's common stock acquires not less than 80% of its outstanding stock in a single transaction.

that, in the event of a merger of the Company or the acquisition of 50% or more of the Company's assets or earning power, the rights may be exercised to acquire common stock of the acquiring company having a value of twice the exercise price of the right. The exercise price of each right is $160. The redemption price is $.01 per share.

On July 15, 1988, soon after the adoption of the new rights plan, a press release was issued announcing that the Chairman of the Company's board, Mr. Harvey Saligman, intended to recommend a major restructuring of Interco to the board at its next meeting.

On July 27, 1988, the Rales brothers filed a Schedule 13D with the Securities and Exchange Commission disclosing that, as of July 11, they owned, directly or indirectly, 3,140,300 shares, or 8.7% of Interco's common stock. On that day, CCA offered to acquire the Company by merger for a price of $64 per share in cash, conditioned upon the availability of financing. On August 8, before the Interco board had responded to this offer, CCA increased its offering price to $70 per share, still contingent upon receipt of the necessary financing.

At the Interco board's regularly scheduled meeting on August 8, Wasserstein Perella, Interco's investment banker, informed the board that, in its view, the $70 CCA offer was inadequate and not in the best interests of the Company and its shareholders. This opinion was based on a series of analyses, including discounted cash flow, comparable transaction analysis, and an analysis of premiums paid over existing stock prices for selected tender offers during early 1988. Wasserstein Perella also performed an analysis based upon selling certain Interco businesses and retaining and operating others. This analysis generated a "reference range" for the Company of $68–$80 per share. Based on

all of these analyses, Wasserstein Perella concluded the offer was inadequate. The board then resolved to reject the proposal. Also at that meeting, the board voted to decrease the threshold percentage needed to trigger the flip-in provision of the rights plan from 30% to 15% and elected to explore a restructuring plan for the Company.

*The Initial Tender Offer for Interco Stock.*

On August 15, the Rales brothers announced a public tender offer for all of the outstanding stock of Interco at $70 cash per share. The offer was conditioned upon (1) receipt of financing, (2) the tender of sufficient shares to give the offeror a total holding of at least 75% of the Company's common stock on a fully diluted basis at the close of the offer, (3) the redemption of the rights plan, and (4) a determination as to the inapplicability of 8 *Del.C.* § 203.[4]

The board met to consider the tender offer at a special meeting a week later on August 22. Wasserstein Perella had engaged in further studies since the meeting two weeks earlier. It was prepared to give a further view about Interco's value. (*See* Mohr Aff. ¶ 14). Now the studies showed a "reference range" for the whole Company of $74–$87. The so-called reference ranges do not purport to be a range of fair value; but just what they purport to be is (deliberately, one imagines) rather unclear. (*See* Mohr Aff. generally).

In all events, after hearing the banker's opinion, the Interco board resolved to recommend against the tender offer. In rejecting the offer, the board also declined to redeem the rights plan or to render 8 *Del. C.* § 203 inapplicable to the offer. Finally, the board refused to disclose confidential information requested by CCA in connection with its tender offer unless and until CCA indicated a willingness to enter into a confidentiality and standstill agreement with the Company.[5]

---

**4.** CCA sued Interco in the federal district court for a determination that Section 203 was an invalid enactment under the federal Constitution. It was unsuccessful in that attempt. *See*

*City Capital Associates LP v. Interco Incorporated,* 696 F.Supp. 1551 (D.Del.1988).

**5.** The standstill agreement would commit CCA not to make any tender offer for three years

The remainder of the meeting was devoted to an exploration of strategic alternatives to the CCA proposal. Wasserstein Perella presented the board with a detailed valuation of each operating component of the Company. The board adopted a resolution empowering management "... to explore all appropriate alternatives to the CCA offer, including, without limitation, the recapitalization, restructuring or other reorganization of the company, the sale of assets of the company in addition to the Apparel Manufacturing Group, and other extraordinary transactions, to maximize the value of the company to the stockholders...." Minutes of Meeting, August 22, 1988.

On August 23, 1988, a letter was sent to CCA informing it that Interco intended to explore alternatives to the offer and planned to make confidential information available to third parties in connection with that endeavor. Interco informed CCA that it would not disclose information to it absent compliance with a confidentiality agreement and a standstill agreement. (*See* fn. 5). Interco's proposal was met with an August 26, 1988 counterproposal by CCA suggesting an alternative confidentiality agreement—without standstill provisions.

Apart from the exchange of letters, there were no communications between CCA and Interco between the time the $70 offer was made on August 22 and a later, higher offer at $72 per share was made on September 10. There is some dispute as to why this occurred; one side claims that CCA did place a phone call to Mr. Saligman on September 7 that was never returned. Mr. Saligman asserts that the call was returned by him and that there was no response from CCA.

In all events, on September 10, the Rales brothers did amend their offer, increasing the price offered to $72 per share. The Interco board did not consider that offer until September 19 when its investment banker was ready to report on a proposed restructuring. At that meeting, the board rejected the $72 offer on grounds of financial inadequacy and adopted the restructuring proposal.

*The Proposed Restructuring.*

Under the terms of the restructuring designed by Wasserstein Perella, Interco would sell assets that generate approximately one-half of its gross sales and would borrow $2.025 billion. It would make very substantial distributions to shareholders, by means of a dividend, amounting to a stated aggregate value of $66 per share. The $66 amount would consist of (1) a $25 dividend payable November 7 to shareholders of record on October 13, consisting of $14 in cash and $11 in face amount of senior subordinated debentures, and (2) a second dividend, payable no earlier than November 29, which was declared on October 19, of (a) $24.15 in cash, (b) $6.80 principal amount of subordinated discount debentures, (c) $5.44 principal amount of junior subordinated debentures, (d) convertible preferred stock with a liquidation value of $4.76, and (e) a remaining equity interest or stub that Wasserstein Perella estimates (based on projected earnings of the then remaining businesses) will trade at a price of at least $10 per share. Thus, the total value of the restructuring to shareholders would, in the opinion of Wasserstein Perella, be at least $76 per share on a fully distributed basis.

The board had agreed to a compensation arrangement with Wasserstein Perella that gives that firm substantial contingency pay if its restructuring is successfully completed. Thus, Wasserstein Perella has a rather straightforward and conventional conflict of interest when it opines that the inherently disputable value of its restructuring is greater than the all cash alternative offered by plaintiffs. The market has not, for whatever reason, thought the prospects of the Company quite so bright. It has, in recent weeks, consistently valued Interco stock at about $70 a share. (The value at which Drexel Burnham has valued the re-

unless asked to do so by the Company; it apparently does not have an out should CCA seek to

make an offer for all shares at a price higher than an offer endorsed by the board.

structuring in this litigation, *see* Winograd Aff. ¶ 14).[6]

Steps have now been taken to effectuate the restructuring. On September 15, the Company announced its plans to sell the Ethan Allen furniture division, which is said by the plaintiffs to be the Company's "crown jewel." Ethan Allen, the Company maintains, has a unique marketing approach which is not conducive to integration of that business with Interco's other furniture businesses, Lane and Broyhill. Moreover, the Company says that Ethan Allen is not a suitable candidate for the cost cutting measures which must be undertaken in connection with the proposed restructuring.

Since Interco announced the terms of the restructuring on September 20, it has made two changes with respect to it. It announced on September 27 first that the dividend declared on October 13, 1988 would accrue interest at 12% per annum from that date to the payment date; and second, that the second phase dividend would similarly accrue interest (currently expected to be at a rate of 13¾% per annum) from the date of its declaration.

*The Present CCA Offer and the Interco Board's Reaction.*

In its third supplemental Offer to Purchase dated October 18, 1988, CCA raised its bid to $74. Like the preceding bid, the proposal is an all cash offer for all shares with a contemplated back-end merger for the same consideration.

At its October 19, 1988 board meeting, the board rejected the $74 offer as inadequate and agreed to recommend that shareholders reject the offer. The board based its rejection both on its apparent view that the price was inadequate and on its belief that the proposed restructuring will yield shareholder value of at least $76 per share.

## II.

This case was filed on July 27, 1988. Following extensive discovery, it was presented on plaintiffs' application for a preliminary injunction on October 24, 1988. As indicated above, the relief now sought has two principal elements. First, CCA seeks an order requiring the Interco board to redeem the defensive stock rights and effectively give the Interco shareholders the opportunity to choose as a practical matter. Second, it seeks an order restraining further steps to implement the restructuring, including any steps to sell Ethan Allen.

In order to justify that relief, plaintiffs offer several theories. First, it is their position that this case involves an interested board which has acted to entrench itself at the expense of the stockholders of the Company. Second, because they assert that the board comprises interested directors, plaintiffs also assert that the proposed restructuring transaction involves self-dealing, and that the board is therefore obligated, under *Weinberger v. U.O.P., Inc.*, Del.Supr., 457 A.2d 701 (1983), to establish the entire fairness of the restructuring and its refusal to rescind the stock rights, which plaintiffs assert it cannot do. Third, plaintiffs urge that under the approach first adopted by the Delaware Supreme Court in *Unocal*, the board's action is said *not* to be reasonable in relation to any threat posed by the plaintiffs because, they say, their noncoercive, all cash offer does not pose a threat. Fourth and last, plaintiffs claim that the proposed restructuring does not importantly differ from a sale of the Company, and that under *Revlon v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173 (1986), the Interco directors have a duty to obtain the highest available price for the Company's stockholders in the market, which the directors have not done.

Interco answers that only the *Unocal* standard applies in this case. Defendants urge that the *Weinberger* entire fairness test is inapposite because there has been no self-dealing. (*See* n. 1, *supra*). Similarly, defendants claim that no *Revlon* duties have arisen because the restructuring does

---

**6.** Interco refers to the risks that this litigation poses to the restructuring and the resulting risk that perhaps the shareholders might have an opportunity to accept that $74 in cash that CCA offers, as accounting for the market's $70 valuation. (*See* Mohr Aff. ¶ 26).

not amount to a sale of the Company and the Company is not, in fact, for sale. *See Ivanhoe Partners v. Newmont Mining Corp., supra.* Defendants state that the Interco board is proceeding in good faith to protect the best interests of the Company's stockholders. The board believes that CCA's offer is inadequate, and therefore constitutes a threat to the Company's stockholders; it is their position that the restructuring and the poison pill are, therefore, reasonable reactions to the threat posed. Moreover, defendants assert that leaving the pill in place to protect the restructuring is reasonable because the restructuring will achieve better value for stockholders than will be garnered by shareholders' acceptance of the plaintiffs' inadequate offer.

### III.

The pending motion purports to seek a preliminary injunction. The test for the issuance of such a provisional remedy is well established. It is necessary for the applicant to demonstrate both a reasonable probability of ultimate success on the claims asserted and, most importantly, the threat of an injury that will occur before trial which is not remediable by an award of damages or the later shaping of equitable relief. Beyond that, it is essential for the court to consider the offsetting equities, if any, including the interests of the public and other innocent third parties, as well as defendants. *See generally Ivanhoe Partners v. Newmont Mining Corp.,* Del.Supr., 535 A.2d 1334 (1987).

■■■ With respect to plaintiffs' request that steps in furtherance of the restructuring transaction be enjoined *pendente lite,* the relief now sought is classically awarded on such a motion where the elements of this test are satisfied. The relief now sought with respect to the board's decision not to redeem the stock rights, however, is another matter. That relief, if awarded now, would constitute affirmative relief.

*Steiner v. Simmons,* Del.Supr., 111 A.2d 574 (1955). Moreover, if it is awarded (and if a majority of shares are tendered into plaintiffs' offer thereafter), it would, in effect, constitute relief that could not later effectively be reversed following trial. It would in that event, in effect, constitute final relief. Therefore, in my opinion, that relief ought not be awarded at this time unless plaintiffs can show that it is warranted based upon facts that are not legitimately in dispute.

It is appropriate, therefore, before subjecting the board's decision not to redeem the pill to the form of analysis mandated by *Unocal,* to identify what relevant facts are not contested or contestable, and what relevant facts may appropriately be assumed against the party prevailing on this point. They are as follows:

*First.* The value of the Interco restructuring is inherently a debatable proposition, most importantly (but not solely) because the future value of the stub share is unknowable with reasonable certainty.

*Second.* The board of Interco believes in good faith that the restructuring has a value of "at least" $76 per share.

*Third.* The City Capital offer is for $74 per share cash.

*Fourth.* The board of Interco has acted prudently to inform itself of the value of the Company.[7]

*Fifth.* The board believes in good faith that the City Capital offer is for a price that is "inadequate."

*Sixth.* City Capital cannot, as a practical matter, close its tender offer while the rights exist; to do so would be to self-inflict an enormous financial injury that no reasonable buyer would do.

*Seventh.* Shareholders of Interco have differing liquidity preferences and different expectations about likely future economic events.

---

7. This fact is assumed for these purposes; surely it is consistent with the record. The board has not, however, endeavored to determine what is the maximum price that CCA might pay. They say it is not part of their duty to enter into

the negotiation that would be necessary to "know" that fact. Insofar as this fact relates to plaintiffs' *Revlon* argument, it is further discussed *infra* at pp. 802-803.

*Eighth.* A reasonable shareholder could prefer the restructuring to the sale of his stock for $74 in cash now, but a reasonable shareholder could prefer the reverse.

*Ninth.* The City Capital tender offer is in no respect coercive. It is for all shares, not for only a portion of shares. It contemplates a prompt follow-up merger, if it succeeds, not an indefinite term as a minority shareholder. It proposes identical consideration in a follow-up merger, not securities or less money.

*Tenth.* While the existence of the stock rights has conferred time on the board to consider the City Capital proposals and to arrange the restructuring, the utility of those rights as a defensive technique has, given the time lines for the restructuring and the board's actions to date, now been effectively exhausted except in one respect: the effect of those rights continues to "protect the restructuring."

These facts are sufficient to address the question whether the board's action in electing to leave the defensive stock rights plan in place qualifies for the deference embodied in the business judgment rule.

## IV.

■ I turn then to the analysis contemplated by *Unocal,* the most innovative and promising case in our recent corporation law. That case, of course, recognized that in defending against unsolicited takeovers, there is an "omnipresent specter that a board may be acting primarily in its own interest." 493 A.2d at 954. That fact distinguishes takeover defense measures from other acts of a board which, when subject to judicial review, are customarily upheld once the court finds the board acted in good faith and after an appropriate investigation. *E.g., Aronson v. Lewis,* Del.Supr., 473 A.2d 805 (1984). *Unocal* recognizes that human nature may incline *even one acting in subjective good faith* to rationalize as right that which is merely personally beneficial. Thus, it created a new intermediate form of judicial review to be employed when a transaction is neither self-dealing nor wholly disinterested. That test has been helpfully referred to as the "proportionality test." [8]

The test is easy to state. Where it is employed, it requires a threshold examination "before the protections of the business judgment rule may be conferred." 493 A.2d 954. That threshold requirement is in two parts. First, directors claiming the protections of the rule "must show that they had reasonable grounds for believing that a danger to corporate policy and effectiveness existed." The second element of the test is the element of balance. "If a defensive measure is to come within the ambit of the business judgment rule, it must be reasonable in relationship to the threat posed." 493 A.2d 955.

Delaware courts have employed the *Unocal* precedent cautiously.[9] The promise of that innovation is the promise of a more realistic, flexible and, ultimately, more responsible corporation law. *See generally,* Gilson & Kraakman, n. 8, *supra.* The danger that it poses is, of course, that courts—in exercising some element of substantive judgment—will too readily seek to assert the primacy of their own view on a question upon which reasonable, completely disinterested minds might differ. Thus, inartfully applied, the *Unocal* form of analysis could permit an unraveling of the well-made fabric of the business judgment rule in this important context. Accordingly, whenever, as in this case, this court is required to apply the *Unocal* form of re-

---

**8.** *See* Gilson & Kraakman, *Delaware's Intermediate Standard for Defensive Tactics: Is There Substance To The Proportionality Review?,* John M. Olin Program in Law & Economics, Stanford Law School (Working Paper No. 45, August, 1988); 44 Bus.Law. ___ (forthcoming February, 1989). Professors Gilson and Kraakman offer a helpful structure for reviewing problems of this type and conclude with a perceptive observation concerning the beneficial impact upon corporate culture that the *Unocal* test might come to have.

**9.** Only two cases have found defensive steps disproportionate to a threat posed by a takeover attempt. *See AC Acquisitions Corp. v. Anderson, Clayton & Co.,* Del.Ch., 519 A.2d 103 (1986); *Robert M. Bass Group, Inc. v. Evans,* Del.Ch., C.A. No. 9953, Jacobs, V.C. (July 14, 1988) [1988 WL 73744].

view, it should do so cautiously, with a clear appreciation for the risks and special responsibility this approach entails.

### A.

Turning to the first element of the *Unocal* form of analysis, it is appropriate to note that, in the special case of a tender offer for all shares, the threat posed, if any, is not importantly to corporate policies (as may well be the case in a stock buy-back case such as *Cheff v. Mathes*, Del. Supr., 199 A.2d 548 (1964) or a partial tender offer case such as *Unocal* itself), but rather the threat, if any, is most directly to shareholder interests. Broadly speaking, threats to shareholders in that context may be of two types: threats to the voluntariness of the choice offered by the offer, and threats to the substantive, economic interest represented by the stockholding.

1. *Threats to voluntariness.* It is now universally acknowledged that the structure of an offer can render mandatory in substance that which is voluntary in form. The so-called "front-end" loaded partial offer—already a largely vanished breed—is the most extreme example of this phenomenon. An offer may, however, be structured to have a coercive effect on a rational shareholder in any number of different ways. Whenever a tender offer is so structured, a board may, or perhaps should, perceive a threat to a stockholder's interest in exercising choice to remain a stockholder in the firm. The threat posed by structurally coercive offers is typically amplified by an offering price that the target board responsibly concludes is substantially below a fair price.[10]

Each of the cases in which our Supreme Court has addressed a defensive corporate measure under the *Unocal* test involved the sharp and palpable threat to sharehold-

ers posed by a coercive offer. *See Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985); *Moran v. Household International, Inc.*, Del.Supr., 500 A.2d 1346 (1985); *Ivanhoe Partners v. Newmont Mining Corp.*, Del.Supr., 535 A.2d 1334 (1987).

2. *Threats from "inadequate" but noncoercive offers.* The second broad classification of threats to shareholder interests that might be posed by a tender offer for all shares relates to the "fairness" or "adequacy" of the price.[11] It would not be surprising or unreasonable to claim that where an offer is not coercive or deceptive (and, therefore, what is in issue is essentially whether the consideration it offers is attractive or not), a board—even though it may expend corporate funds to arrange alternatives or to inform shareholders of its view of fair value—is not authorized to take preclusive action. By preclusive action I mean action that, as a practical matter, withdraws from the shareholders the option to choose between the offer and the status quo or some other board sponsored alternative.

■ Our law, however, has not adopted that view and experience has demonstrated the wisdom of that choice. We have held that a board is not required simply by reason of the existence of a noncoercive offer to redeem outstanding poison pill rights. *See Facet Enterprises, Inc. v. Prospect Group, Inc.*, Del.Ch., C.A. No. 9746, Jacobs, V.C. (April 15, 1988) [1988 WL 36140]; *Nomad Acquisition Corp. v. Damon Corporation*, Del.Ch., C.A. No. 10173, Hartnett, V.C. (September 16, 1988) [1988 WL 96192]; *Doskocil Companies Incorporated v. Griggy*, Del.Ch., C.A. No. 10095, Berger, V.C. (October 7, 1988) [1988 WL 105751].[12] The reason is simple. Even where an offer is noncoercive, it may repre-

---

**10.** A different form of threat relating to the voluntariness of the shareholder's choice would arise in a structurally noncoercive offer that contained false or misleading material information.

**11.** Timing questions may be seen as simply a special case of price inadequacy. That is, the price offered is seen as inadequate because the firm's prospects will appear better later; thus, a

fair price now would be higher than that offered.

**12.** *See also CFRT v. Federated Department Stores, Inc.*, 683 F.Supp. 422 (S.D.N.Y.1988); *BNS, Inc. v. Koppers Company, Inc.*, 683 F.Supp. 458 (D.Del.1988) (both of which apply Delaware law).

sent a "threat" to shareholder interests in the special sense that an active negotiator with power, in effect, to refuse the proposal may be able to extract a higher or otherwise more valuable proposal, or may be able to arrange an alternative transaction or a modified business plan that will present a more valuable option to shareholders. *See, e.g., In Re J.P. Stevens & Co., Inc. Shareholders Litigation,* Del.Ch., 542 A.2d 770 (1988) and *CFRT v. Federated Department Stores, Inc.,* 683 F.Supp. 422 (S.D.N.Y.1988) where defensive stock rights were used precisely in this way. *See also* Gilson & Kraakman, *supra,* n. 8 at pp. 26–30. Our cases, however, also indicate that in the setting of a noncoercive offer, absent unusual facts, there may come a time when a board's fiduciary duty will require it to redeem the rights and to permit the shareholders to choose. *See Doskocil Companies Incorporated v. Griggy, supra,* slip op. at 11; *Mills Acquisition Co. v. Macmillan, Inc.,* Del.Ch., C.A. No. 10168, Jacobs, V.C. (October 17, 1988), slip op. at 49–50 [1988 WL 108332].

### B.

■ In this instance, there is no threat of shareholder coercion. The threat is to shareholders' economic interests posed by an offer the board has concluded is "inadequate." If this determination is made in good faith (as I assume it is here, *see* p. 795, *supra*), it alone will justify leaving a poison pill in place, even in the setting of a noncoercive offer, for a period while the board exercises its good faith business judgment to take such steps as it deems appropriate to protect and advance shareholder interests in light of the significant development that such an offer doubtless is. That action may entail negotiation on behalf of shareholders with the offeror, the institution of a *Revlon*-style auction for

the Company, a recapitalization or restructuring designed as an alternative to the offer, or other action.[13]

■ Once that period has closed, and it is apparent that the board does not intend to institute a *Revlon*-style auction,[14] or to negotiate for an increase in the unwanted offer, and that it has taken such time as it required in good faith to arrange an alternative value-maximizing transaction, then, in most instances, the legitimate role of the poison pill in the context of a noncoercive offer will have been fully satisfied.[15] The only function then left for the pill at this end-stage is to preclude the shareholders from exercising a judgment about their own interests that differs from the judgment of the directors, who will have some interest in the question. What then is the "threat" in this instance that might justify such a result? Stating that "threat" at this stage of the process most specifically, it is this: *Wasserstein Perella may be correct in their respective valuations of the offer and the restructuring but a majority of the Interco shareholders may not accept that fact and may be injured as a consequence.*

### C.

■ Perhaps there is a case in which it is appropriate for a board of directors to in effect permanently foreclose their shareholders from accepting a noncoercive offer for their stock by utilization of the recent innovation of "poison pill" rights. If such a case might exist by reason of some special circumstance, a review of the facts here show this not to be it. The "threat" here, when viewed with particularity, is far too mild to justify such a step in this instance.

Even assuming Wasserstein Perella is correct that when received (and following a

---

**13.** I leave aside the rare but occasionally encountered instance in which the board elects to do nothing at all with respect to an any and all tender offer.

**14.** If a board elects to conduct an auction of a company, the deployment or continuation of a poison pill will serve as a method to permit the board to act as an effective auctioneer.

**15.** The role of a poison pill in an auction setting may presumably be affected by provisions in the bid documents. For example, should a disinterested board or committee agree in good faith to a provision requiring that a pill remain in place following bidding (which they might do in order to elicit bidders), such a commitment would presumably validly bind the corporation.

period in which full distribution can occur), each of the debt securities to be issued in the restructuring will trade at par, that the preferred stock will trade at its liquidation value, and that the stub will trade initially at $10 a share, the difference in the values of these two offers is only 3%, and the lower offer is all cash and sooner. Thus, the threat, at this stage of the contest, cannot be regarded as very great even on the assumption that Wasserstein Perella is correct.

More importantly, it is incontestable that the Wasserstein Perella value is itself a highly debatable proposition. Their prediction of the likely trading range of the stub share represents one obviously educated guess. Here, the projections used in that process were especially prepared for use in the restructuring. Plaintiffs claim they are rosy to a fault, citing, for example, a $75 million cost reduction from remaining operations once the restructuring is fully implemented. This cost reduction itself is $2 per share; 20% of the predicted value of the stub. The Drexel Burnham analysis, which offers no greater claim to correctness, estimates the stub will trade at between $4.53 and $5.45. Moreover, Drexel opines that the whole package of restructure consideration has a value between $68.28 and $70.37 a share, which, for whatever reason, is quite consistent with the stock market price of a share of Interco stock during recent weeks.[16]

The point here is not that, in exercising some restrained substantive review of the board's decision to leave the pill in place, the court finds Drexel's opinion more persuasive than Wasserstein Perella's. I make no such judgment. What is apparent —indeed inarguable—is that one could do so. More importantly, without access to Drexel Burnham's particular analysis, a shareholder could prefer a $74 cash payment now to the complex future consideration offered through the restructuring. The defendants understand this; it is evident.

The information statement sent to Interco shareholders to inform them of the terms of the restructuring accurately states and repeats the admonition:

> There can be no assurances as to actual trading values of [the stub shares].

\* \* \* \* \* \*

> It should be noted that the value of securities, including newly-issued securities and equity securities in highly leveraged companies, are subject to uncertainties and contingencies, all of which are difficult to predict and therefore any valuation [of them] may not necessarily be indicative of the price at which such securities will actually trade.

October 1, 1988 Interco Information Statement, at 3.

Yet, recognizing the relative closeness of the values and the impossibility of knowing what the stub share will trade at, the board, having arranged a value maximizing restructuring, elected to preclude shareholder choice. It did so not to buy time in order to negotiate or arrange possible alternatives, but asserting in effect a right and duty to save shareholders from the consequences of the choice they might make, if permitted to choose.

Without wishing to cast any shadow upon the subjective motivation of the individual defendants (*see* p. 796, *supra*), I conclude that reasonable minds not affected by an inherent, entrenched interest in the matter, could not reasonably differ with respect to the conclusion that the CCA $74 cash offer did not represent a threat to shareholder interests sufficient in the circumstances to justify, in effect, foreclosing shareholders from electing to accept that offer.

Our corporation law exists, not as an isolated body of rules and principles, but rather in a historical setting and as a part of a larger body of law premised upon shared values. To acknowledge that directors may employ the recent innovation of "poison pills" to deprive shareholders of the ability effectively to choose to accept a noncoercive offer, after the board has had a reasonable opportunity to explore or cre-

16. *See* n. 6, *supra.*

ate alternatives, or attempt to negotiate on the shareholders' behalf, would, it seems to me, be so inconsistent with widely shared notions of appropriate corporate governance as to threaten to diminish the legitimacy and authority of our corporation law.

I thus conclude that the board's decision not to redeem the rights following the amendment of the offer to $74 per share cannot be justified in the way *Unocal* requires.[17] This determination does not rest upon disputed facts (*see* pp. 795–796, *supra*) and I conclude that affirmative relief is therefore permissible at this stage.

## V.

■ As to irreparable injury, I am moved most importantly by the interests of shareholders—third parties to this action but persons whose interests may legitimately be considered in granting injunctive relief in this sort of case. The loss of an opportunity to effectively choose is, for them, irreparable. While CCA is a shareholder, it here asserts interests as a buyer, not a seller of stock. The question of a bidder/shareholder's right to enforce fiduciary duties owed to shareholders does not often arise as a practical matter, because there are typically several stockholder class actions that proceed on the same schedule as an action by the bidder.[18] Therefore, to my knowledge, this court has not been required to focus upon either the question whether a bidder may enforce such rights, *qua* stockholder, or whether a bidder may, at least in some circumstances, have some other state law source of right to enforce duties owed to shareholders.

As the courts are principally concerned with interests of shareholders in actions in which corporate fiduciary duties are tested, and as the interests of the shareholders of Interco in this instance are implicated here to precisely the same extent as they would have been had the pending class action been consolidated with this action, it seems

to make little sense for the court, having determined that the board now has a duty to shareholders to redeem the rights, to fail to protect shareholders by not enforcing that duty specifically. Therefore, in this case, I will hold that CCA, as a shareholder, has standing to assert the rights of a shareholder of Interco to require the board to redeem the stock rights in issue. I note that *as to that relief*, I perceive no conflict of interest between CCA and other shareholders since its offer is noncoercive. I would distinguish the cited case of *Newell Co. v. Wm. E. Wright Co.*, Del.Ch., 500 A.2d 974 (1985) on the basis that I did not there regard the pill as having a preclusive effect, which as later events showed, was correct in that instance.

## VI.

■ Plaintiffs also seek an order enjoining any act in furtherance of the restructuring *pendente lite*. Specifically, they seek to stop the shopping of Ethan Allen Company (or *a fortiori* its sale) and the dividend distribution of cash and securities to be accomplished no sooner than November 7. The theory offered is essentially the same as that put forward in support of the poison pill relief: these actions are defensive; they are taken by a board that is interested (recall that half of the board members are officers of the Company, or its subsidiaries); that the board is motivated to entrench itself for selfish reasons; it cannot demonstrate the fairness of these acts and, even if it need not, they cannot be justified under *Unocal* as reasonable in relation to any threat posed by the CCA offer.

I take up the specific acts sought to be preliminarily enjoined separately. Before doing so, I refer to note 1 above. Here too, the appropriate test to determine whether these steps qualify for the deferential business judgment form of review is set forth

---

17. By that point, it was apparent that the board sought, by leaving the rights in place, only to "protect the restructuring"; and while not utterly clear, it by then appeared that CCA's frustrated, self-induced successive bids had come to about the top of their range.

18. Here, while a class action complaint purportedly on behalf of Interco shareholders has been filed in this court, it has been inactive so far as the record discloses.

in *Unocal.* Each of the steps quite clearly was taken defensively as part of a reaction to the Rales brothers' efforts to buy Interco, but neither is a self-dealing transaction of the classic sort.

As to the sale of Ethan Allen, I conclude that that step does appear clearly to be reasonable in relation to the threat posed by the CCA offer. Above I indicated that it was the case that one could regard either of these alternatives as the more desirable, depending upon one's liquidity preference, expectation about future events, etc. The board itself was, of course, supplied with specific expert advice that stated that the CCA offer was inadequate. I assumed that the board acted in good faith in adopting that view.

I make some additional assumptions about the effort to sell the Ethan Allen business. First, the business is being competently shopped. The record suggests that. Second, the board will not sell it for less than the best available price. Third, the board will not sell it for less than a fair price (*i.e.* there will be no fire sale price). In the absence of indications by plaintiffs to the contrary, the board is entitled to these assumptions.

The question of reasonableness in this setting seems rather easy. Of course, a board acts reasonably in relation to an offer, albeit a noncoercive offer, it believes to be inadequate when it seeks to realize the full, market value of an important asset. Moreover, here the board puts forth sensible reasons why Ethan Allen should be sold under its new business plan. (*See* p. 794, *supra*). Finally, as a defensive measure, the sale of Ethan Allen is not a "show stopper" insofar as this offer is concerned. This is not a "crown jewel" sale to a favored bidder; it is a public sale. On my assumption that the price will be a fair price, the corporation will come out no worse from a financial point of view. Moreover, the Rales' interests are being supplied the same information as others concerning Ethan Allen and they may bid for it. I do understand that this step complicates their life and indeed might imperil CCA's ability to complete its transaction.

CCA, however, has no right to demand that its chosen target remain in status quo while its offer is formulated, gradually increased and, perhaps, accepted. I therefore conclude that the proposed sale of Ethan Allen Company is a defensive step that is reasonable in relation to the mild threat posed by this noncoercive $74 cash offer.

■ As to the dividend question, I will reserve judgment. It is, however, difficult for me to imagine how a pro rata distribution of cash to shareholders could itself ever constitute an unreasonable response to a bid believed to be inadequate. (Collateral agreements respecting use of such cash would raise a more litigable issue). *Cf. Ivanhoe Partners v. Newmont Mining Corp., supra.* I reserve judgment here, however, because I have not found in the record, and thus have not studied, the covenants contained in the various debt securities. They perhaps have not yet been drafted. Those covenants may contain provisions offering antitakeover protection. In the event they do, the question whether distribution of such securities was a reasonable step in reaction to the threat of an inadequate offer (of the specific proportions involved here) will be one that should be reviewed with particularity. The efficient adjudication of this case, however, warrants issuing an order on what has been decided. Should plaintiffs want a ruling on this issue, they will have to submit a written statement outlining any antitakeover effect the securities proposed to be dividended may contain.

### VII.

■ Having concluded, under the *Unocal* analysis, that—putting aside the question of the poison pill—the restructuring appears at this stage to be a reasonable response to the CCA offer that is perceived as inadequate, it is necessary to address briefly CCA's argument that the implementation of that restructuring in this setting constitutes a violation of the board's fiduciary duty under *Revlon v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173 (1986). That argument, in essence, is

that the restructuring—which involves the sale of assets generating about one-half of Interco's sales; massive borrowings; and the distribution to shareholders of cash and debt securities (excluding the preferred stock) per share equal to approximately 85% of the market value of Interco's stock [19]—in effect involves the breakup and sale of the Company as it has existed. This argument contends that such a transaction, even if not in form a sale, necessarily involves a duty recognized in *Revlon* to sell the Company, through an auction, only for the best available price.

To this assertion, the defendants reply that Interco is not for sale and, in any event, the board intends to force upon the stockholders the best available transaction anyway. In authorizing management to discuss the terms on which the Company might be sold (which the board did), the board was only fulfilling its obligation to be informed; it has never made a determination that it was in the best interests of the shareholders to sell the Company. Thus, it is said that the teaching of *Revlon,* even if it is presumed to reach every sale of a Company, is not implicated here.

I agree that the board of Interco has no duty, in the circumstances as they now appear, to conduct an auction sale of the Company. I do not think this question, however, is answered by merely referring to a board resolve to try to keep the Company independent.

The contours of a board's duties in the face of a takeover attempt are not, stated generally, different from the duties the board always bears: to act in an informed manner and in the good faith pursuit of corporate interests and only for that purpose. *Unocal,* of course, adds that where the board acts to defeat such an offer, its steps must be reasonable in light of the threat created by the offer. But I do not think that *Revlon* intended to narrowly circumscribe the range of reactions that a board may make in good faith to an at-

tempt to seize control of a corporation. Even when the corporation is clearly "for sale," a disinterested board or committee maintains the right and the obligation to exercise business judgment in pursuing the stockholders' interest. *See, e.g., In Re J.P. Stevens & Co., Inc. Shareholders Litigation,* Del.Ch., 542 A.2d 770 (1988); *In Re Fort Howard Corp. Shareholders Litigation,* Del.Ch., C.A. No. 9991, Allen, C. (August 8, 1988) [1988 WL 83147]; *Mills Acquisition Co. v. Macmillan, Inc.,* Del.Ch., C.A. No. 10168, Jacobs, V.C. (October 17, 1988).

*Revlon* dealt factually with an ongoing bidding contest for corporate control. In that context, its holding that the board could not prefer one bidder to another but was required to permit the auction to proceed to its highest price unimpeded, can be seen as an application of traditional Delaware law: a fiduciary cannot sell for less when more is available on similar terms.[20]

*Revlon* should not, in my opinion, be interpreted as representing a sharp turn in our law. It does not require, for example, that before every corporate merger agreement can validly be entered into, the constituent corporations must be "shopped" or, more radically, an auction process undertaken, even though a merger may be regarded as a sale of the Company. But mergers or recapitalizations or other important corporate transactions may be authorized by a board only advisedly. There must be a reasonable basis for the board of directors involved to conclude that the transaction involved is in the best interest of the shareholders. This involves having information about possible alternatives. The essence of rational choice is an assessment of costs and benefits and the consideration of alternatives.

Indeed, the central obligation of a board (*assuming it acts in good faith* —an assumption that would not hold for *Revlon*) is to act in an informed manner. When the transaction is so fundamental as

---

**19.** That is, the value (using Wasserstein Perella numbers) of the distribution of cash and debt is approximately $60 and the market price of the stock is approximately $70.

**20.** *Robinson v. Pittsburgh Oil Refining Corp.,* Del.Ch., 126 A. 46 (1924); *Thomas v. Kempner,* Del.Ch., C.A. No. 4138, Marvel, V.C. (March 22, 1973) [1973 WL 460].

the restructuring here (or a sale or merger of the Company), the obligation to be informed would seem to require that reliable information about the value of alternative transactions be explored. When the transaction is a sale of the Company, in which the interests of current stockholders will be converted to cash or otherwise terminated, the requirement to be well informed would ordinarily mandate an appropriate probing of the market for alternatives (and a public auction, should interest be shown). Particularly is that true when a sale is to a management affiliated group (the ubiquitous management LBO transactions) for apparent reasons involving human frailty. But even in that setting, fiduciary obligations can be met in ways other than a traditional auction, if the procedure supplies the board with information from which it can conclude that it has arranged the best available transaction for shareholders. *See, e.g., In Re Fort Howard Corp. Shareholders Litigation, supra* (post contract "market check" adequate to meet fiduciary duties).

 When, as in *Revlon*, two bidders are actively contesting for control of a company, the most reliable source of information as to what may be the best available transaction will come out of an open contest or auction. Thus, *Revlon* holds that where it is clear that the firm will be sold, and such a contest is going forward, the board's duty is to act with respect to it so as to encourage the best possible result from the shareholders' point of view.

 When the transaction is a defensive recapitalization, a board may not proceed, consistently with its duty to be informed, without appropriately considering relevant information relating to alternatives.[21] But if a board does probe prudently to ascertain possible alternative values, and thus is in a position to act advised-

ly, I do not understand the *Revlon* holding as requiring it to turn to an auction alternative, if it has arrived at a good faith, informed determination that a recapitalization or other form of transaction is more beneficial to shareholders. *Compare Black & Decker Corp. v. American Standard, Inc.,* 682 F.Supp. 772 (D.Del.1988). Should the board produce a reactive recapitalization, any steps it may take to implement it in the face of an offer for all stock may, as here, be judicially tested not under *Revlon*, but under the *Unocal* form of judicial review.

Here, given the significance of the restructuring and its character as an alternative to an all cash tender offer, the requirement to inform oneself of possible alternatives may be seen as demanding. It appears, however, that defendants have appropriately informed themselves. While the record is not well developed (defendants aggressively sought to prevent disclosure of alternative prospects being considered—*see* Mohr deposition), it appears that Interco officials did explore with expert third parties the Company's value in an LBO transaction. Moreover, the board has seen that no offer competing with the CCA offer has emerged over an extended period. Finally, the board was advised by a competent banker (albeit with a conflicting financial interest) concerning value.

Accordingly, I can detect no basis to conclude that the board did not proceed prudently and in good faith to pursue the restructuring as an alternative to the CCA offer. I do not read *Revlon* as requiring it to follow any different course.

\* \* \*

The parties may confer concerning an appropriate form of mandatory injunction order to be entered. Assuming agreement

---

**21.** A delicate question is how far a board must go to satisfy its obligation to inform itself, with respect to the question whether the bidder would pay more. Must it disclose information? Must it negotiate? Surely it need not enter into negotiations if it has not reached a decision to sell the Company, but its duty to shareholders may not permit the board to simply ignore the offeror. This issue may come down to the reasonableness of the terms of a confidentiality and standstill agreement. These agreements which always play an important role for a period in cases of this kind rarely get litigated. *But see In Re J.P. Stevens & Co., Inc. Shareholders Litigation, supra.*

cannot be reached, plaintiff shall schedule a conference with the court promptly.